**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 2 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

THE GUIDES, LTD., a Colorado limited
liability company, doing business as The
Africa House; and TSEGHE FOOTE,
individually,

    Plaintiffs/Appellants/Cross-
    Appellees,

    v.

THE YARMOUTH GROUP PROPERTY
MANAGEMENT, INC.*; TABOR
CENTER ASSOCIATES, L.P.,

    Defendants/Appellees/Cross-
    Appellants.

No. 99-1388
No. 99-1389
No. 99-1392
No. 99-1455
No. 99-1459
No. 99-1464

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 96-S-2516)

---

Darold W. Killmer (David H. Miller and Mari Newman with him on the brief), Miller,
Lane, Killmer & Greisen, LLP, Denver, Colorado, for the Plaintiffs/Appellants/Cross-
Appellees.

Robert Lawrence Ashe, Jr., Paul, Hastings, Janofsky & Walker, LLP, Atlanta, Georgia,
(Kelly J. Koelker and Maureen E. O'Neill, Paul, Hastings, Janofsky & Walker, LLP,
Atlanta, Georgia; Dov M. Grunschlag, Steinhart & Falconer, LLP, San Francisco,
California; and James L. Aab, Aab & Botts, LLC, Denver, Colorado, with him on the

---

* The Yarmouth Group Property Management, Inc., is now known as Jones Lang
LaSalle Property Management, Inc.

brief for Tabor Center Associates, L.P.; David H. Stacy, Elzi Pringle & Gurr, Denver, Colorado, for The Yarmouth Group Property Management, Inc., joins in the brief for Tabor Center Associates, L.P.), for the Defendants/Appellees/Cross-Appellants.

Before **BRISCOE** and **MCWILLIAMS**, Circuit Judges; and **JENKINS**, Senior District Judge.[**]

**BRISCOE**, Circuit Judge.

Plaintiffs Tseghe Foote and The Guides, Ltd., d/b/a The Africa House (hereinafter Africa House) brought a civil rights action against defendants The Yarmouth Group Property Management, Inc., and Tabor Center Associates, L.P., alleging the defendants had violated 42 U.S.C. § 1981, and had intentionally interfered with Africa House's prospective business advantages in conjunction with the defendants' eviction and failure to lease retail space for Africa House. A jury found in favor of Foote and Africa House on all counts, and awarded each plaintiff compensatory and punitive damages. Following post-trial motions, the district court dismissed Foote as an individual plaintiff for lack of standing and vacated the jury's award to her. The district court also granted Africa House's request for attorney fees, although it reduced the requested rates, and further granted prejudgment interest to Africa House.

The defendants appeal the district court's denial of their motion for judgment as a

[**] The Honorable Bruce S. Jenkins, United States Senior District Judge for the District of Utah, sitting by designation.

2

matter of law and motion for new trial or remittitur, as well as the district court's award of prejudgment interest. The plaintiffs cross-appeal the dismissal of Foote as an individual plaintiff and the reduction in attorney fees. Our jurisdiction is pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

I.

The Guides, Ltd., is a subchapter S corporation organized under Colorado law and doing business as The Africa House, a retail store specializing in African art and artifacts. Tseghe Foote, an immigrant from Ethiopia, is its sole shareholder and president. In 1993, Foote entered into two separate short-term lease agreements with the prior owners of the Tabor Center, a downtown mall in Denver, Colorado, for Africa House to occupy space 322 at the Center. The first short-term agreement ran from February through August of 1993, and the second ran month-to-month beginning in September 1993. Under the terms of the leases, the rent consisted of a base amount of approximately $23 per square foot, and 15% of sales above a predetermined level. The lease did not require Africa House to make any payments for mall operating costs or to incur any improvement or build-out expenses. In exchange for these favorable terms, the lease provided that the owners could terminate the tenancy or relocate the business with fifteen days' notice if they required space 322 for any reason. The possibility of relocation was dependant upon available space and the owners' judgment concerning merchandising mix and balance.

In October 1994, defendant Tabor Center Associates acquired the Tabor Center

and became the plaintiffs' landlord. In February 1995, defendant Yarmouth assumed management responsibilities for the Center. In an effort to improve the profitability of the Center, Yarmouth implemented new leasing procedures that included negotiating long-term leases with future tenants. Yarmouth also approached existing tenants to negotiate new long-term and short-term tenancies. However, Yarmouth did not approach Foote, and in fact had no contact with her until September 1996 when Foote approached Yarmouth to discuss the possibility of renewing or entering into a new lease.

From this initial meeting until late October 1996, Foote had several meetings with representatives of Yarmouth concerning the possibility of leasing space at the Tabor Center. However, Yarmouth would not clarify its intentions or engage in serious negotiations. Foote and Yarmouth discussed a possible space for relocation of the business, but Yarmouth would not assure Foote that the space would be available, even though it was undisputed there were many empty spaces available at the Tabor Center. During these attempted negotiations, a representative from Yarmouth made misrepresentations to Foote concerning the lease at space 322 and commented that her store: (1) did not "mix well" with other tenants; (2) was not glamourous enough; (3) "had to go"; (4) did not "fit the image of Tabor Center"; (5) should change its name; (6) devalued the Tabor Center; and (7) was unsophisticated. Yarmouth also drew up blueprints which did not include Foote's store.

On September 13, 1996, General Nutrition Centers (GNC), a national vitamin and

health chain, entered into a ten-year lease with Yarmouth for space 322 at an annual rent double that charged for Africa House. Foote was not informed of this lease while she negotiated with Yarmouth. On September 24, 1996, Foote arrived at her store to find a man making detailed measurements. When she called management to find out the purpose of the measurements, she was informed that it was an attempt to lower the insurance rates for the Center. It was only later that Foote learned that space 322 had been leased to GNC, and the measurements were made in connection with that lease.

On September 26, Yarmouth informed Foote that Africa House would not be offered a long-term lease because its gross sales did not meet or exceed $800,000. Yarmouth was also reluctant to offer Africa House a different space or a short-term lease. On October 14, 1996, the defendants served Foote with notice terminating her lease for space 322. The termination notice did not contain any offer of relocation or a short-term lease, even though other tenants who had been terminated by Yarmouth were offered such options. Foote hired an attorney to negotiate with Yarmouth. Yarmouth eventually offered Africa House a four-month lease for space 202 in the Center, but Foote rejected the lease due to its short duration.

On October 29, 1996, Foote filed the complaint in this action against Yarmouth and Tabor Center Associates, along with an application for a temporary restraining order. Before a hearing on the order, the parties stipulated to relocate the business to space 202 until the legal issues were resolved. In the complaint, Foote brought claims on her own

behalf and on behalf of Africa House, alleging that the defendants had (1) unlawfully interfered with the right to make and enforce a contract, in violation of 42 U.S.C. § 1981; and (2) unlawfully interfered with the right to lease real property, in violation of 42 U.S.C. § 1982. Africa House also brought a claim alleging that the defendants had intentionally interfered with its prospective business advantages.

A jury found in favor of both Foote and Africa House on all claims. The jury awarded $200,000 in compensatory damages and $1,500,000 in punitive damages to Foote; and awarded $150,000 in compensatory damages and $1,000,000 in punitive damages to Africa House. The defendants filed a motion for new trial or remittitur, which the district court denied. The defendants also filed a motion for judgment as a matter of law. The district court granted this motion in part, finding that Foote's claims merged with those of Africa House and, therefore, she was without standing. The court dismissed Foote and set aside the verdict and damages in her favor. The plaintiffs filed an application for attorney fees pursuant to 42 U.S.C. § 1988(b). The district court granted this motion, but reduced the hourly rates requested. The district court further granted the plaintiffs' motion for prejudgment interest.

II.

We first address plaintiffs' contention that the district court erred in dismissing Foote's § 1981 and § 1982 claims for lack of standing. The district court reasoned that dismissal was necessary because the injury was suffered by Africa House rather than

6

Foote, in that the defendants had refused to contract with or lease property to Africa House rather than to Foote individually, and that Foote's claim for injuries was the result of that refusal. The plaintiffs argue on appeal that Foote has standing because as sole shareholder of Africa House she suffered injury separate and distinct from that of Africa House, and further that she has standing in her own right because she signed a guaranty contract in her 1993 lease which gave rise to a special duty separate and distinct from that owed to Africa House.

We review issues of standing de novo. *Faustin v. City & County of Denver, Colorado*, 268 F.3d 942, 947 (10th Cir. 2001). In order to determine whether Foote has standing to claim injury under §1981 and § 1982, we first consider the language used in those statutes. Section 42 U.S.C. 1981 guarantees the right of all persons to "make and enforce" contracts. Section 42 U.S.C. 1982 guarantees the right to "inherit, purchase, lease, sell, hold, and convey real and personal property." It has been held that "[p]rudential limitations on standing ordinarily require that an action under section 1981 or 1982 be brought by the direct victims of the alleged discrimination because they are best situated to assert the individual rights in question." *Clifton Terrace Assocs., Ltd. v. United Technologies Corp.*, 929 F.2d 714, 721 (D.C. Cir. 1991).

In the instant case, Foote alleged discrimination based on her race. However, the party seeking to contract with the defendants and to lease property, and thus the direct victim of the alleged discrimination, was Foote's corporation, Africa House, rather than

Foote herself.[1]  We agree that Africa House has standing to assert discrimination claims under § 1981 and § 1982 where such discrimination is based on the race of one of its employees.  *See Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068 (1992).[2]  The question is whether Foote has standing to bring a claim for emotional damages which she herself allegedly suffered as a result of the defendants' discrimination.

We have held that, as a general rule, a stockholder cannot maintain a personal action against a third party for harm caused to the corporation.  *Stat-Tech Intern. Corp. v. Delutes*, 47 F.3d 1054, 1060 (10th Cir. 1995).  There is, however, an exception to this rule where the actions of the third party that injure the corporation also cause injury to the shareholder which is unique to himself or herself as a shareholder of the corporation and not suffered by the other shareholders.  *Id.*

Foote alleged that she suffered emotional distress as a result of the defendants'

---

[1]　According to the Stipulated Pretrial Order, the plaintiffs' claims with regard to § 1981 and § 1982 are that "defendants have denied The Africa House the opportunity to rent or negotiate for the rental of retail space at The Shops at Tabor Center."  App. at 61. The complaint identifies Africa House as the corporation.  *Id.* at 36.

[2]　In *Gersman*, a corporation, CSI, brought a § 1981 claim against a defendant who had ended a contractual relationship when the defendant learned that the president of CSI was Jewish.  The court held that CSI had standing to bring suit under § 1981 because the injury it suffered fell "within the zone of interests protected by the statute," in that the termination of the contract was "solely because an individual associated with CSI was Jewish."  931 F.2d at 1569.  *See also Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982) (holding theater corporation had standing to assert claim alleging it was discriminated against because it sought to involve the black and Hispanic communities).

8

actions. However, this distress arose from the failure of the defendants to contract with or lease to Africa House and was a product of the economic damages which were suffered by the corporation. Foote suffered no violation of her contract rights or right to lease that was in any way different from the violations claimed by Africa House. Her claim is derivative of that of Africa House and she does not have standing to sue on her own behalf. *See Bellows v. Amoco Oil Co.*, 118 F.3d 268, 276-77 (5th Cir. 1997) (holding that plaintiff who was president of a corporation and 51% shareholder had no individual cause of action under § 1981 for emotional distress arising from discrimination against the corporation based on plaintiff's race).

Foote also argues that she has standing as the result of her guarantee of the corporation's 1993 lease. However, we reject the premise that a stockholder's status as a guarantor gives the stockholder status to assert an individual claim against a third party where that harm is derivative of that suffered by the corporation. *See Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 640 (9th Cir. 1988); *Nicholson v. Ash*, 800 P.2d 1352, 1357 (Colo. App. 1990). Foote's status as guarantor of the previous lease is of no significance to her claim that the defendants refused to contract or lease to her corporation.

We hold that the district court did not err in dismissing Foote as an individual plaintiff and setting aside the damages awarded to her.

9

III.

We next consider the defendants' contention that their motion for judgment as a matter of law should have been granted because there was insufficient evidence to sustain the jury's finding of intentional race discrimination. In reviewing the district court's denial of a Rule 50(b) motion for judgment as a matter of law, we apply the same standard as the district court. *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000). We review all the evidence in the record, construing it and all inferences drawn therefrom most favorably to the nonmoving party, and refrain from making credibility determinations or weighing the evidence. *Id.* A party is entitled to judgment as a matter of law only if there is no legally sufficient evidentiary basis for the claim. *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091, 1103 (10th Cir. 2001).

A § 1981 or § 1982 plaintiff must prove by a preponderance of the evidence that the defendant intentionally discriminated against him or her on the basis of race. *See Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000). Such proof may come from either direct or indirect evidence. *Hampton*, 247 F.3d at 1107. When asked to review the sufficiency of the evidence in §1981 and § 1982 claims based on indirect discrimination, we assume that the plaintiff met his or her burden of proving a prima facie claim and the claim properly went to trial, leaving only the question of whether the plaintiff presented sufficient evidence to support the jury's determination that the adverse action was taken on the basis of race. *Id.* at 1108; *Stewart*, 217 F.3d at 1288.

10

Based on the record as a whole, we conclude there was sufficient evidence from which a jury could infer that the defendants discriminated against Africa House. Although the undisputed evidence indicated that Africa House was always an excellent tenant at the Tabor Center, and although the defendants could not identify a legitimate reason why she would not be an appropriate tenant in the future, the defendants made no attempt to discuss the possibility of a future lease. The defendants told Foote that Africa House was not eligible for a long-term lease because it did not have enough gross annual sales; however, at the same time they offered a long-term lease to another business whose year-to-date sales were approximately $20,000 less and whose rent-to-sales ratio was comparable. When Foote attempted to pursue a short-term lease, she was told that spaces were unavailable or was begrudgingly offered only a temporary lease even though, at the same time, the defendants were soliciting other tenants for short-term leases. At one point, the defendants made misrepresentations to Foote concerning why they were taking measurements of her business, telling her the measurements were for insurance purposes when they were actually in preparation for a new tenant.

Further, there is evidence from which a jury could infer that Foote's race and the perceived race of Africa House's clientele were the basis for this discriminatory conduct. There was testimony from Jana Thorpe, a tenant who was offered a long-term lease, that when she asked whether Foote's business would be offered a long-term lease, she was told that the business "didn't fit the proposed image of the Tabor Center." App. at 1343.

11

She interpreted this statement to mean that "Africa House didn't fit the image of the Tabor Center [because] Africa House was a store owned by a black person that sold things from Africa and had black customers." *Id.* at 1344. There was also testimony that Yarmouth management told Foote that her business did not "mix well," was not glamourous enough, and devalued the Center, while at the same time tenants who were not black were encouraged to sign leases. Further, management stated at various times that the name "Africa House" should be changed.

Reviewing the evidence presented at trial, we cannot say that "the evidence points but one way, and is susceptible to no reasonable inferences supporting [the plaintiffs'] claim." *Hampton*, 247 F.3d at 1107. The district court did not err in denying the defendants' motion for judgment as a matter of law based on the sufficiency of the evidence.

IV.

The defendants next contend there was insufficient evidence to support the jury's determination that they interfered with Africa House's prospective business advantages, and that the district court erred in denying their motion for judgment as a matter of law as to that claim. They argue that Africa House failed to introduce evidence that the defendants induced or otherwise caused a third person not to enter into or continue a prospective business relationship.

After a careful review of the record, we are unable to find any evidence to support

the jury's verdict.  On appeal, Africa House similarly fails to point to any evidence which would support the verdict.  As a result, we reverse the jury's verdict on this issue.

V.

The defendants next argue that the district court committed several trial errors which, individually and cumulatively, require reversal.  "When a party seeks 'reversal of a jury verdict or of a denial of a motion for new trial' by claiming trial errors, it 'must establish the alleged trial errors were both prejudicial and clearly erroneous.'"  *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1247 (10th Cir. 1999) (quoting *Gust v. Jones*, 162 F.3d 587, 591 (10th Cir. 1998)).

First, defendants assert that it was error for the district court to allow the lay opinion testimony of three witnesses:  Jana Thorpe, Phil Pankoff, and David Fine.  Under Federal Rule of Evidence 701, lay opinion must be "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  The admission of lay opinion testimony is within the sound discretion of the district court.  *Gust*, 162 F.3d at 595.  We conclude that the district court did not abuse its discretion in admitting the testimony.  The testimony of Thorpe, Pankoff and Fine was rationally based on their perceptions and helpful to a determination of facts in issue.

The defendants also argue that the district court erred in denying their motions in limine seeking to exclude (1) the plaintiffs' expert witness, Dr. William Kaempfer, and

13

(2) irrelevant comparative evidence. The district court denied the motions, reserving the issues for trial. At trial, the defendants did not object to any of the testimony identified in their motions in limine. As a result, they have failed to preserve these alleged errors for appeal. *See Hampton*, 247 F.3d at 1113 (stating that failure to make a timely and proper objection constitutes waiver of the issue absent plain error resulting in manifest injustice). We conclude that the defendants have failed to show the denial of their motions in limine resulted in manifest injustice.

The defendants further contend that the district court abused its discretion when it granted the plaintiffs' motion in limine to exclude a finding made by the Colorado Civil Rights Commission that there was no cause to believe that the defendants had discriminated against the plaintiffs in the leasing decision. However, the decision of whether to admit or exclude findings of a civil rights commission lies within the sound discretion of the district court. *See Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 821-22 (10th Cir. 1981). The defendants sought to admit the finding on the grounds that it might contain statements to the commission that would contradict Foote's testimony at trial. The district court excluded the evidence, but stated that it would entertain a motion for reconsideration in the event that Foote actually did make statements at trial that conflicted with her testimony to the commission. The defendants made no attempt to do so, and do not now point to any conflicting statements. The district court did not abuse its discretion in granting the plaintiffs' motion in limine to exclude the commission report.

14

The defendants next argue that the district court erred when it allowed plaintiffs' counsel, during closing argument, to refer to the size and scope of the defendants' operations. Plaintiffs' counsel implored the jury to "send a clear message" "all the way to Sydney, Australia where [the defendants] are based on the other side of the world," and further implied that the large size, international operations, and presumed profitability of the defendants warranted a large award of punitive damages. App. at 1725-27. However, the defendants did not object to this statement at closing argument, and we will not address it on appeal. *See Glenn v. Cessna Aircraft Co.*, 32 F.3d 1462, 1465 (10th Cir. 1994) (holding that "[a] party who waits until the jury returns an unfavorable verdict to complain about improper comments during opening statement and closing argument is bound by that risky decision and should not be granted relief")

Finally, the defendants contend that the district court erred in allowing Foote to remain as a plaintiff in the case. They argue that her presence in the case confused the jury. However, at no time during trial did the defendants object to Foote's presence as a plaintiff. Under the circumstances, there was no error.

VI.

We next consider the defendants' argument that the compensatory damages awarded to Africa House were not supported by sufficient evidence. The jury was instructed that, in determining compensatory damages, it could consider (1) financial losses, including lost profits and expenses; and (2) loss of good name, reputation, honor

15

or integrity. The jury ultimately awarded $150,000 in compensatory damages.

We will uphold a jury's award of damages unless it is clearly erroneous or there is no evidence to support the award. *See Brown v. Presbyterian Healthcare Services*, 101 F.3d 1324, 1330 (10th Cir. 1996). "[T]he amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it." *Advantor Capital Corp. v. Yeary*, 136 F.3d 1259, 1266 (10th Cir. 1998) (quoting *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985)).

Dr. William Kaempfer testified as to Africa House's lost profits, ultimately fixing the lost profits as a result of the defendants' conduct at $75,316.95. The defendants argue that this testimony was unreliable. However, the jury apparently found the testimony credible. "It is within the virtually exclusive purview of the jury to evaluate credibility and fix damages." *United Intern. Holdings v. Wharf (Holdings)*, 210 F.3d 1207, 1230 (10th Cir. 2000). Thus, Dr. Kaempfer's testimony was sufficient to support $75,316.95 in compensatory damages.

We do not, however, reach the same conclusion regarding the remaining $74,683.05 in compensatory damages awarded by the jury. The plaintiffs contend that the award is supported by the testimony of Andrew Warren, Lewis Gaiter, Kathleen Scheuerman, and Foote herself. However, while financial consultants Warren and Gaiter suggested new business strategies which would help Africa House increase its business, most of these business strategies were not adopted, and in fact the suggestions were made

16

more than one year prior to the alleged actions of the defendants.  They expressed no opinion concerning lost profits or loss of Africa House's good name, honor or integrity.  Similarly, Kathleen Scheuerman, an employee of Africa House, testified only that the business in the new space was not as profitable as it was in the old space, and her testimony in no way supports an award for lost profits above that presented by Dr. Kaempfer, nor does it provide any evidence of a loss of good name, reputation, honor or integrity.

Finally, Foote's testimony fails to support lost profits over and above those calculated by her expert, and does not mention any damage to Africa House's good name, reputation, honor, or integrity.  As a result, we conclude there is insufficient evidence to sustain a compensatory damage award over and above $75,316.95, and remand with directions that the district court enter a remittitur reducing the compensatory damages awarded to Africa House to that amount or, in the alternative, order a new trial.

## VII.

The defendants contend that the district court erred in denying their motion for judgment as a matter of law, arguing the punitive damages awarded to Africa House are not supported by the evidence.[3]

---

[3]    The plaintiffs argue that defendants failed to raise the issue of insufficient evidence to support punitive damages in their Fed. R. Civ. P. 50(a) motions, and therefore should not have been allowed to raise the issue in a Fed R. Civ. P. 50(b) motion, or on appeal.  However, the plaintiffs themselves failed to object on this basis in their response to the defendants' Rule 50(b) motion.  Under such circumstances, the plaintiffs may not

"Whether sufficient evidence exists to support punitive damages is a question of law reviewed de novo." *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1262 (10th Cir. 1995). We have held that the standard for punitive damages in actions claiming a violation of federal civil rights requires that the discrimination must have been malicious, willful, and in gross disregard of the rights of the plaintiff. *See Hampton*, 247 F.3d at 1115.

We conclude that this standard for punitive damages cannot be satisfied by a showing of intentional discrimination alone. Otherwise, every jury verdict in a successful § 1981 or § 1982 claim would include an award of punitive damages. Instead, we believe that a plaintiff must prove that the defendant acted with malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination.

In examining the evidence, we are not persuaded that the plaintiffs proved the defendants acted in malicious, willful or gross disregard of their rights. While the indirect evidence in this case is sufficient to establish that the defendants intentionally discriminated against the plaintiffs on the basis of race, there is no evidence which would

---

assert the failure of the defendants to raise the insufficient evidence issue. When the non-moving party fails to raise the inadequacy of a Rule 50(a) motion in opposition to a Rule 50(b) motion, that party cannot raise waiver as an argument on appeal. *See Williams v. Runyon*, 130 F.3d 568, 572 (3d Cir. 1997); *Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir. 1996); *Whelan v. Abell*, 48 F.3d 1247, 1251-53 (D.C. Cir. 1995); *Gibeau v. Nellis*, 18 F.3d 107, 109 (2d Cir. 1994); *Collins v. Illinois*, 830 F.2d 692, 698 (7th Cir. 1987); *Beauford v. Sisters of Mercy Province of Detroit, Inc.*, 816 F.2d 1104, 1108 n.3 (6th Cir. 1987); *Halsell v. Kimberly Clark Corp.*, 683 F.2d 285, 293-95 (8th Cir. 1982). Therefore, we will address the issue.

18

show that the defendants acted in malicious or willful disregard of Africa House's rights. As a result, we reverse the district court's denial of the defendants' motion for judgment as a matter of law as to the $1 million in punitive damages awarded to Africa House.

VIII.

The defendants next contend that the district court abused its discretion when it applied a state law rate of interest to compute the award of prejudgment interest to Africa House. The district court applied a 9% interest rate to the prejudgment interest award pursuant to Colo. Rev. Stat. Ann. § 13-21-101. The defendants argue that the district court should have applied the rate of interest for post-judgment awards found in 28 U.S.C. § 1961 because the district court's jurisdiction was based on a federal question jurisdiction rather than diversity jurisdiction.

We agree that a federal rate of interest rather than the state rate applies where jurisdiction is based on a federal question, and therefore the district court erred in determining that it was bound to apply the state rate of interest. *See Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994) (stating that "federal law governs the range of remedies, including the allowance and rate of prejudgment interest, where a cause of action, as in this case, arises out of federal statute"). *See also U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1254 (10th Cir. 1988) (stating that an award of prejudgment interest in a federal securities law claim is controlled by federal law), *overruled by implication on other*

19

*grounds by Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994). We therefore remand to the district court to fix the rate of prejudgment interest. *See Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 764 (10th Cir. 1997) (stating where the prejudgment rate is governed by federal law, a court is free to choose any rate which would fairly compensate the plaintiff for the delay); *see also Jones v. Unum Life Ins. Co. of America*, 223 F.3d 130, 139 (2d Cir. 2000) (holding that because there is no federal statute that purports to control the rate of prejudgment interest, the rate is left to the discretion of the district court).

The defendants also contend that the district court erred in awarding prejudgment interest from the date that the claim accrued rather than as the lost profits occurred. They argue that because the lost profits did not all occur at the time the claim accrued, awarding prejudgment interest from the date the claim accrued gives a windfall to the plaintiffs.

The purpose of prejudgment interest is "'to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of judgment.'" *Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1554 (10th Cir. 1992) (quoting *U.S. Industries*, 854 F.2d at 1256). It appears that the district court in the case at hand may have felt bound to apply state law found in Colo. Rev. Stat. Ann. § 13-21-101 to the calculation of prejudgment interest, which provides for prejudgment interest to be calculated from the date the action accrued. On remand, we direct the district court to

consider the timing of the award of prejudgment interest that will serve to fairly compensate Africa House for the deprivation of the monetary value of its loss.

IX.

The plaintiffs also contend that the district court erred in reducing the rates at which attorney fees were calculated for purposes of its award under 42 U.S.C. § 1988(b). The plaintiffs had requested fees for a total of 482.70 hours by attorney Darold Killmer at $250 per hour, 309.55 hours by attorney David Miller at $250 per hour, and 118.60 hours by attorney Mari Newman at $115 per hour. The district court reduced Killmer's and Miller's hourly rates to $200 and reduced Newman's hourly rate to $100, finding that the plaintiffs had failed to produce evidence showing that the higher rates were reasonable.

"In light of the discretionary nature of the district court's decision, we review an attorney's fee award under 42 U.S.C. § 1988(b) for an abuse of discretion." *Robinson v. City of Edmond*, 160 F.3d 1275, 1280 (10th Cir. 1998). We review the district court's factual findings for clear error, and the court's legal conclusions de novo. *Id.*

A claimant who files an application for attorney fees under § 1988(b) has the burden to prove that the fee is reasonable. *Id.* A reasonable rate is the prevailing market rate in the relevant community. *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th Cir. 1996). To meet this burden, the claimant must:

> produce satisfactory evidence - in addition to the attorney's own affidavits -
> that the requested rates are in line with those prevailing in the community
> for similar services by lawyers of reasonably comparable skill, experience
> and reputation. A rate determined in this way is normally deemed to be

21

reasonable and is referred to - for convenience - as the prevailing market rate.

*Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984).

Here, the evidence fails to show that the requested rates were reasonable. While Killmer submitted an affidavit as to the prevailing rates at his firm and another local firm, the rates charged by attorneys at the other firm ranged from only $160 to $190 per hour. An affidavit from Lynn Feiger, a former partner of Killmer, stated only that she charged $310 per hour for the same type of work. While this evidence serves to establish Feiger's rate, it does not establish the rates charged were consistent with rates charged by comparably skilled lawyers in the community. Similarly, the only evidence of the appropriateness of Newman's hourly rate was provided in the affidavit of Killmer.

The defendants contend that, instead of relying on their asserted rates, the district court incorrectly relied on its own knowledge. However, we are unpersuaded by this argument. Where a district court does not have before it adequate evidence of prevailing market rates, the court may use other relevant factors, including its own knowledge, to establish the rate. *See Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243 (10th Cir. 1998).

We conclude that the district court did not err in finding that the plaintiffs failed to satisfy their burden of establishing the reasonableness of the requested attorney fees and in reducing those rates according to its own knowledge of the prevailing market rate.

22

X.

The decision of the district court dismissing Foote for lack of standing is AFFIRMED. We VACATE the judgment and direct the district court to dismiss Africa House's claim of intentional interference with prospective business advantages. We REVERSE the district court's denial of the defendants' request for a remittitur and REMAND with directions that the district court enter a remittitur order reducing the compensatory damages awarded to Africa House to $75,316.95 or, in the alternative, to grant a new trial. We AFFIRM the district court's denial of the defendants' motion for a new trial for alleged evidentiary errors. We REVERSE the district court's denial of the defendants' motion for judgment as a matter of law as to the punitive damages awarded to Africa House and VACATE the award of punitive damages. We REVERSE the district court's order granting prejudgment interest at the state rate from the date the claim accrued, and REMAND for a determination of the rate of prejudgment interest and for a determination of the date or dates of accrual. We AFFIRM the district court's award of attorney fees.

**Nos. 99-1388 et al., <u>The Guides v. The Yarmouth Group</u>**

**JENKINS,** Senior District Judge, concurring and dissenting.

I concur with the majority opinion with one modest exception. I would reverse the order of the court below dismissing Ms. Foote's jury award and reinstate her compensatory damages judgment of $200,000.

Section 1981 states that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981 (1994). Section 1982 states that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982 (1994). Initially enacted pursuant to the Civil Rights Act of 1866, sections 1981 and 1982 were "intended [to protect] . . . citizens of the United States in enjoyment of certain rights without discrimination on account of race, color, or previous condition of servitude," <u>United States v. Cruikshank</u>, 92 U.S. 542, 555 (1875), or because of their ancestry or ethnic characteristics, <u>St. Francis College v. Al-Khazraji</u>, 481 U.S. 604 (1987), and to "confer on [African-Americans] a civil status equivalent to that enjoyed by white persons." <u>Valle v. Stengel</u>, 176 F.2d 697, 703 (3d Cir. 1949). The protection afforded by these statutes finds its roots in the Thirteenth and Fourteenth Amendments. <u>See</u> <u>Runyon v. McCrary</u>, 427 U.S. 160, 168–72 (1976) (Thirteenth Amendment); <u>Jones v. Alfred H. Mayer Co.</u>, 392 U.S. 409, 437–44 (1968) (same); <u>General Bldg. Contractors Ass'n v. Pennsylvania</u>, 458 U.S. 375, 384–91 (1982) (Fourteenth Amendment).

Although neither section 1981 or 1982 define "person" or "citizen," respectively, the United States Supreme Court has provided useful guidance. In Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252 (1977), the Court stated that, for the purposes of standing under the Fourteenth Amendment, "a corporation . . . has no racial identity and cannot be the direct target of the . . . alleged discrimination." Id. at 263.

In today's opinion, the majority disregards Arlington Heights in concluding that Africa House has standing because under sections 1981 and 1982, "the direct victim of the alleged discrimination, was Foote's corporation, Africa House, rather than Foote herself."

In this case, Africa House by itself cannot have standing to assert section 1981 and 1982 claims because, as Arlington Heights explains, a corporation cannot be the direct target or victim of racial discrimination. However, the Court in Arlington Heights did not address whether a corporation would have standing if it were an indirect target of racial discrimination, that is, whether a corporation has standing when it suffers an injury such as lost profits resulting from unlawful discrimination directed at a member of a protected class. Cases since Arlington Heights indicate that a corporation that is harmed by discriminatory action has standing to litigate that harm. See Hudson Valley Freedom Theater, Inc. v. Heimbach, 671 F.2d 702, 708 (2d Cir. 1982) (Pierce, J., concurring) ("[U]nder the 14th Amendment and the statutes which seek to implement its purposes,

2

any person, including a colorless corporate 'person', although not a member of a protected group, has an implied cause of action against any other person who, with racially discriminatory intent, causes . . . it . . . [an] injury."). This view comports with the Court's dictum in <u>Arlington Heights</u> and the purposes for which Congress enacted sections 1981 and 1982.

The majority relies on <u>Gersman v. Group Health Association, Inc.</u>, 931 F.2d 1565 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068 (1992), to hold that "Africa House has standing to assert discrimination claims under § 1981 and § 1982 where such discrimination is based on the race of one of its employees."

I agree with the reasoning in <u>Gersman</u>,[1] and I agree that the jury correctly found

---

[1]<u>Gersman</u> adequately addresses the difficult issues raised in <u>Arlington Heights</u>. In <u>Gersman</u>, the defendant argued that the corporation, CSI, did not have standing to bring a cause of action under section 1981 because CSI lacked a racial or religious identity. <u>Gersman</u>, 931 F.2d at 1568. The court declined to rule that "racial identity is a predicate to discriminatory harm" and instead approached the issue "by assuming that, if a corporation can suffer harm from discrimination, it has standing to litigate that harm." <u>Id.</u> Addressing this issue further, the court stated

> a party may suffer a legally cognizable injury from discrimination even where that party is not a member of a protected minority group. Thus, it is not necessary to determine whether CSI has a "racial identity." [Given that a corporation exists as an entity separate from its employees, officers and stockholders,] [s]uch a query would lead to difficulties of determining what, in fact, constitutes a racial identity. . . . For example, in the present case, CSI alleges that it has a racial identity because it is operated and owned by Mr. and Mrs. Gersman, who are both Jewish. Yet the situation would be no different if Gentile shareholders owned CSI and [the defendant] ended the contractual relationship because the corporation had a single Jewish employee. Thus, CSI need not have a "Jewish identity," or even have predominantly Jewish owners or employees, in order to suffer injury from [the defendant's] discriminatory actions.

3

that Africa House suffered an injury resulting from unlawful discrimination. However, the jury also found that the defendants had discriminated against Ms. Foote because of her race and that Ms. Foote suffered a compensable injury distinct from that suffered by Africa House.[2] Ms. Foote, as is required by our prior cases,[3] is a member of the protected class under sections 1981 and 1982 and was the direct target of the defendants' racial

---

Id. at 1570.

[2]The jury was instructed:

> If you find that either or both of the Defendants discriminated on the basis of Plaintiffs' race in the making or enforcement of a lease for the Tabor Center for which they were qualified, you may award reasonable compensation for the following:
>
> – financial losses (for either Plaintiff Tseghe Foote or Plaintiff Africa House);
> – pain, suffering, and physical and emotional distress (for Plaintiff Tseghe Foote only).
>
> . . .
>
> If you find for the Plaintiffs, or either of them, on more than one claim for relief, you may award damages only once for the same business losses.

(Jt. App. vol. I-A, at 308, 310.)

[3]In this Circuit, a racial identity is the cornerstone of a section 1981 and 1982 cause of action and a necessary element of a plaintiff's prima facie case. See Shawl v. Dillards, Inc., No. 99-1409, 2001 WL 967887, at *2 (10th Cir. Aug. 27, 2001) ("To establish a claim under § 1981, the plaintiffs must show that (1) they are members of a protected class . . . ." (citing Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1101 (10th Cir.2001))).

4

discrimination whether she was acting in her individual capacity in seeking to enter into the prospective lease contract,[4] or was acting as agent for her corporation. She is entitled to redress for her own injuries that also fall clearly within the zone of interests protected by sections 1981 and 1982. The defendants caused injury both to Africa House and Ms. Foote by refusing to deal with Ms. Foote—a refusal the jury found to be racially motivated. Affirming the defendants' liability to the corporate plaintiff, Africa House, acknowledges that the corporation suffered an injury resulting from unlawful discrimination—racial discrimination for which Ms. Foote served as the very human direct target.

In dismissing Ms. Foote's claims, the majority relies on Bellows v. Amoco Oil Company, 118 F.3d 268 (5th Cir. 1997). However, Bellows does not support the majority's holding for several reasons. First, in Bellows, the jury found in favor of the defendant Amoco on the corporate plaintiff's section 1981 claim. The corporate plaintiff, Phillips Industrial Constructors, Inc. ("PICI"), did not appeal the jury's determination and was therefore not before the Fifth Circuit at all. As the court itself stated: "The obvious problem that Bellow faces with [his] argument, of course, is that the jury found that

---

[4]The majority bases its holding that the corporation was the direct victim of the alleged discrimination, in part, on the fact that the injury—the refusal to contract with or lease property—was suffered by Africa House, not Ms. Foote individually. However, the majority ignores evidence in the record that suggests that Ms. Foote leased space from the defendants under her own name, "Tseghe Foote, Tenant." On the existing record, whether Africa House was to be the party to the prospective contract is ambiguous at best. (Jt. App. vol. X, at 2445–49.)

5

Amoco did not interfere with PICI's contracts, or ability to contract, with Amoco on the basis of race." Id. at 276. In other words, the court found that Bellow's claim, as it was dependent on PICI's dismissed claim against Amoco, was meritless on appeal. Second, the facts are distinguishable from the facts of the present case in that Bellow's claim was one step removed from the cause of action as expressed by PICI. That is, in Bellows, plaintiff Bellow claimed that Amoco discriminated against him on the basis of his race by engaging in conduct that had the effect of terminating, modifying, or changing Bellow's right to contract with PICI as distinguished from PICI's right to contract with Amoco. Id. at 272–73.

Ms. Foote is not asserting that the defendants interfered with her right to contract with Africa House. Ms. Foote is asserting that she has an injury resulting directly from the defendants' discriminatory conduct towards her, separate and distinct from that suffered by Africa House—an issue not raised or dealt with in Bellows or Gersman. Rather than her claim being "derivative of that of Africa House," if anything, Africa House's claim is derivative of the unlawful discrimination Ms. Foote experienced firsthand in dealing with the defendants. Africa House could make no contract without her participation. The jury found that the defendants frustrated Ms. Foote's efforts to obtain a new lease, and did so because of Ms. Foote's race, thereby harming both Ms. Foote and Africa House.

The majority dismisses Ms. Foote's harm as merely "a product of the economic

6

damages which were suffered by the corporation." Yet the uncontroverted testimony of Ms. Foote and other witnesses established that she became deeply disturbed beginning in September 1996—before Africa House had suffered any actual economic loss. The jury found in Ms. Foote's favor, awarding her $200,000 in damages.

The majority has simply substituted its judgment for that of the jury concerning whether Ms. Foote suffered the mental anguish that she and others testified to at trial as resulting from the discrimination she experienced.

I would therefore hold that both Africa House and Ms. Foote have standing to assert the section 1981 and 1982 causes of action against the defendants, and that the district court's ruling as to Ms. Foote should be reversed and judgment in favor of Ms. Foote should be reinstated as to compensatory damages.