**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 22 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

RUEBEN E. DURAN,

      Plaintiff-Appellant,

v.

COMMUNITY FIRST
BANKSHARES, INC., doing business
as Community First National Bank,

      Defendant-Appellee.

No. 03-1171
(D.C. No. 01-N-1631 (CBS))
(D. Colo.)

---

**ORDER AND JUDGMENT** *

---

Before **EBEL** , **BALDOCK** , and **LUCERO** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination

of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

---

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Rueben E. Duran appeals, pro se, from the district court's grant of summary judgment in favor of Community First National Bank (CFNB) on his claims for discrimination under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, and under 42 U.S.C. §§ 1981 and 1985(3).  Mr. Duran argues that he presented sufficient evidence of disputed facts to survive summary judgment on all of his claims.  We review the district court's grant of summary judgment de novo, applying the same standard as the district court.  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  We affirm.

**Factual Background**

CFNB is a national bank with branches across the United States, including one in Trinidad, Colorado.  Mr. Duran is a forty-five year old man of Hispanic descent who resides in Trinidad, Colorado.  In July 1999, Mr. Duran applied for a real estate construction loan in the amount of $82,100.  Several days later, Mr. Duran submitted a second loan application for a business loan in the amount of $25,000 for a company called ConTech.  The loan proposal was to build a "spec home" on property owned by Mr. Duran.  R. Vol. I, Doc. 50 at 2, ¶¶ 4-5.  A "spec home" is a house built in the hopes that a purchaser will buy it after it is completed.  *Id.* ¶ 4.

Mr. Duran was the sole applicant on both loans. The real estate loan was to cover the costs of construction for the spec home. The business loan was, in Mr. Duran's words, for "business start-up costs and . . . working capital" during the construction of the spec home. *Id.* ¶ 5. Mr. Duran intended to use the proceeds from the business loan as his income in order to make the monthly payments required on the construction loan.

ConTech was not incorporated, but was to be a sole proprietorship owned by Mr. Duran. Neither ConTech nor Mr. Duran had ever built for sale any type of home. Charles Duran, Mr. Duran's father, who was to be president of ConTech, did have extensive experience working on commercial construction projects. Mr. Duran had also assisted his father in remodeling his parents' home and adding an office addition, measuring twelve feet by twenty-eight feet, to an industrial building he owned. Mr. Duran had been unemployed for seven years before his loan applications and has used, as his main source of income, rent payments from the lease of the industrial building, which never exceeded $10,600 in one year. At the time Mr. Duran applied for the loans, he had no income whatsoever because the industrial building had no tenant, and he had $100 in savings.

Richard Trice, CFNB's Senior Vice President and Loan Officer in Trinidad, reviewed Mr. Duran's loan requests using a worksheet he uses to evaluate all commercial loan applications. Trice concluded that Mr. Duran did not qualify for

the loans and informed him of that conclusion in an August 19, 1999 letter. The

letter stated that Mr. Duran's request had been denied because:

> (1) There is no secondary source of repayment, should the spec home
> fail to sell in a timely manner. Ability to service debt is based solely
> on the sale of the home.
> (2) Insufficient current cash flow: unable to verify monthly income.
> (3) Insufficient capital to carry any cost overruns; all capital needs
> are being financed.
> (4) Insufficient experience in projects of this type.

*Id*. Supp. Vol. III, Tab G at Ex. 11. Trice also sent Mr. Duran an ECOA Notice

of Action form that listed the principal reasons for the adverse action:

> (1) Your income was insufficient for the amount of credit requested.
> (2) We were unable to verify your income.
> (3) Your application reveals that current obligations are excessive in
> relation to income.
> (4) You lack an established earnings record.
> (5) . . . Insufficient secondary source of repayment; Insufficient
> capital.

*Id*.

CFNB had a policy of avoiding collateral-based lending for all loans

because foreclosure was an adversarial and expensive process. As a general rule,

therefore, the Bank required applicants for commercial loans to have significant

income and/or liquid assets that could be used to repay the loans. CFNB's written

loan policy provides: "[C]ollateral is not a substitute for the borrower's ability to

repay . . . . Cash flow is the primary source of repayment; collateral is a

secondary source of repayment . . . ." *Id.* Supp. Vol. IV at 5.

CFNB also generally avoided giving construction loans for spec homes because they were regarded as high risk.  J. Thomas Burrell only recalls four loans for spec home construction in his nine years as the branch's president.  CFNB's loan policy provides:  "Generally, speculative construction loans will be considered to builders that can demonstrate financial strength, liquidity and cash flow to service the debt."    *Id.* at 20.  Additionally, CFNB discouraged capital loans and loans to new businesses.  Their policy states:

> We . . . discourage loans to new businesses unless management has appropriate and related experience, the business is adequately capitalized, and the loan is well-secured . . . .
>
> . . .
>
> It is the policy of this Bank to discourage capital loans . . . .  [A] capital loan is . . . a term loan whose purpose is to improve the capitalization of the business.  It is usually the intent of the owner to pay the loan with profits from the business.  Such a loan is usually long-term, weakly collateralized, and too risky.

*Id.* at 9.

After Mr. Duran received the letter rejecting his loan applications, his father called Burrell and scheduled a meeting with him.  At the meeting Burrell and Trice informed Charles Duran that CFNB would consider providing the loans if Mr. Duran could address some of CFNB's concerns by modifying his applications.  They suggested that Mr. Duran consider selling the industrial building in order to have more liquidity, but Charles Duran rejected that idea.

They suggested also that Charles Duran act as a cosigner on the loan to improve the loan applications, but this suggestion was rejected as well. During the meeting Burrell and Trice explained that the two loans would be considered as one large loan for 100 percent financing, but Charles Duran insisted that the loans were separate.

Other than demanding that CFNB consider the loans as two separate loans, Mr. Duran and his father never offered any modifications to Mr. Duran's loan applications. Mr. Duran never went to CFNB or sought to meet with anyone at CFNB in regard to his loan applications. Instead, Mr. Duran and his father wrote six different letters to management at CFNB alleging discrimination against them as Hispanics, demanding an investigation, and seeking approval of the loans. One of these letters was written to a loan officer in Fargo, North Dakota. Charles Mausbach, CFNB's regional manager, received a copy of this letter and sent an electronic message to Burrell and Trice telling them that he had gotten a letter from Charles Duran "claiming discrimination on a loan request for his company, ConTech. They claim it is because they are Hispanic!!" *Id.* Supp. Vol. II, Doc. 51, Tab 11, Ex. 44 at 2. Trice responded to Mausbach's e-mail, "Not sure what else we can do to smooth the waters, other than give them the loan." *Id.* Mausbach replied, "[o]bviously, this is a pretty weak company, right? . . .

[S]imply outline the key issues in the credit and the denial . . . . Someone from corporate will need to respond and support your decision." *Id.*

Mausbach responded to the Durans' letter on behalf of CFNB. In this letter, Mausbach stated that the denial of the loans was consistent with CFNB's lending policy but that Mr. Duran should return to the bank in an attempt to find alternatives to modify the applications and ultimately receive approval. Charles Duran sent two more letters to CFNB. Mausbach wrote to the Durans again and reiterated that both Trice and Burrell were willing to visit with them further to discuss modifying the loan applications and that Charles Duran's co-signature might help. Mausbach also informed the Durans that CFNB did not consider the pledging of additional collateral a primary or secondary source of repayment, but rather looked to income streams as a source of repayment.

The Durans sent another letter containing the same accusations. Mausbach responded by offering to send Mr. Duran's applications to Robert Kaufman, the bank's Regional Credit Officer, for an independent review. Mausbach then wrote the Durans a letter to inform them that Kaufman had concurred that the loan, as presented, did not meet CFNB's standard credit policy. Mr. Duran wrote another letter complaining that Kaufman had ulterior motives and argued "you are discounting our 'income' before we have a chance to earn it." *Id.* Supp. Vol. III,

Tab G at Ex. 30. Mausbach sent Mr. Duran a letter and informed him that he would no longer correspond with him.

Mr. Duran filed a complaint against CFNB alleging that he was discriminated against on the basis of his race when CFNB denied his loan applications. Mr. Duran alleged that this discrimination violated the ECOA and 42 U.S.C. § 1981. Additionally, Mr. Duran claimed that there was a conspiracy among two or more of CFNB's executive officers to deny him his rights under the ECOA in violation of 42 U.S.C. § 1985. The district court granted summary judgment in favor of CFNB on all of Mr. Duran's claims. This timely appeal followed.

**ECOA Claim**

Mr. Duran contends that he presented sufficient evidence of disputed facts to survive summary judgment on his ECOA claim. The relevant ECOA provision states: "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction–(1) on the basis of race, color, religion, national origin, sex or marital status, or age . . . ." 15 U.S.C. § 1691(a). In order to survive summary judgment, Mr. Duran must come forward with

sufficient evidence of race discrimination to create a triable issue of fact. [1] He has failed to do so.

Mr. Duran's first argument is that CFNB discriminated against him by considering his two separate loan applications together. CFNB considered Mr. Duran's applications as one loan because of their common purpose: to finance the building of the same spec home. R. Vol. I, Doc. 52 at 2, ¶ 5. The construction loan was to pay for the materials and the business loan was to provide income during the construction period and to provide a means to pay the construction loan. Mr. Duran speculates that combining the loans indicates that CFNB had a discriminatory motive, but he provides no concrete evidence to that effect.

Mr. Duran next argues that his collateral should have been considered as a source of repayment for the loans. But CFNB's lending guidelines establish that "collateral is not a substitute for the borrower's ability to repay" and that

---

[1] It is an open question in this circuit whether the *McDonnell Douglas* burden shifting analysis applies to ECOA claims. We need not decide the issue here because Mr. Duran has not carried his burden under either a *McDonnell Douglas* analysis or a traditional proof analysis. Under a *McDonnell Douglas* analysis, Mr. Duran must establish the following elements for his prima facie case: (1) he is a member of a protected class; (2) he applied for a loan from CFNB; (3) he was qualified for the loan; (4) despite being qualified for the loan his application was denied. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973); *Matthiesen v. Banc One Mortgage Corp*., 173 F.3d 1242, 1246 (10th Cir. 1999). Because Mr. Duran cannot demonstrate that he was qualified for the loan, he cannot establish his prima facie case and his claim must fail.

"speculative construction loans will be considered to builders that can demonstrate financial strength, liquidity and cash flow to service the debt." R. Supp. Vol. IV at 5, 20.    Mr. Duran did not satisfy CFNB's guidelines because he had no other income from which to make the required payments.  As the district court properly noted, Mr. Duran's "argument that the bank should change its lending requirements fails to demonstrate that the Bank's reasons for denying [his] loans are improper criteria."    *Id.*, Vol. I, Doc. 54 at 14.

Mr. Duran offers some additional complaints about the way CFNB handled his loan applications, but these arguments demonstrate only that he disagrees with CFNB's lending requirements.  Mr. Duran fails to offer any evidence linking CFNB's loan practices and policies to race discrimination.  Further, he offers no evidence of individuals with similar economic qualifications who received similar loans from CFNB or any other bank.  Summary judgment on his ECOA claim is therefore appropriate.

## Section 1981 Claim

Section 1981 prohibits racial discrimination in the making and enforcement of private contracts.  42 U.S.C. § 1981.  It provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . . "    *Id.* § 1981(a).  Mr. Duran must prove intentional discrimination

through direct or indirect evidence to prevail on his § 1981 claim. *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1073 (10th Cir. 2002).

Mr. Duran argues that the e-mail back-and-forth between Mausbach and Trice constitutes direct evidence of discriminatory intent because Mausbach wrote:

> The holding company in Fargo just got a letter from Charles Duran . . . claiming discrimination on a loan request from his company, Contech. They claim it was because they are Hispanic!! Judging by the letter, they probably deserved to be turned down, but we may need to smooth the waters a bit with them. They are threatening [a] lawsuit (surprise, surprise).

R. Supp. Vol. II, Doc. 51, Tab 11 at Ex. 44. This message, however, does not amount to direct evidence of discrimination because it does not show that Mausbach had negative feelings towards Hispanics or that Mausbach treated Mr. Duran differently because he was Hispanic. Rather, this e-mail simply repeats the Durans' contention that they felt they were being discriminated against because they are Hispanic and demonstrates that Mausbach wanted to take steps to avoid the lawsuit threatened by the Durans.

Because Mr. Duran must rely on indirect evidence, we need to apply the *McDonnell Douglas* burden shifting framework. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225-26 (10th Cir. 2000). To establish a prima facie case under § 1981, Mr. Duran must show: "(1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis

-11-

of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101-02 (10th Cir. 2001). The district court assumed for the purposes of summary judgment that Mr. Duran had stated a prima facie case under § 1981 and it shifted the burden to CFNB to produce a legitimate non-discriminatory reason for its actions and found that CFNB had not met that burden. Although we agree with the district court's ultimate conclusion on this claim, we disagree with its assumption that Mr. Duran established his prima facie case. Because Mr. Duran did not offer any evidence that CFNB intended to discriminate on the basis of race, he did not establish his prima facie case and his § 1981 claim must fail.

### Section 1985 Claim

Section 1985(3) prohibits two or more persons from conspiring "for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ." 42 U.S.C. § 1985(3). To state a claim under § 1985, a plaintiff must show: (1) a conspiracy, motivated by racially discriminatory animus; (2) to deprive plaintiff of equal protection of the constitution or laws; (3) an act in furtherance of the conspiracy; and (4) a deprivation of rights resulting therefrom. *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993). Like Mr. Duran's § 1981 claim,

-12-

this claim fails because Mr. Duran has not shown a racial, discriminatory animus on the part of CFNB. There is no evidence that any of CFNB's executives sought to conspire against Mr. Duran because he is Hispanic. Further, Mr. Duran's claim fails because § 1985(3) only covers private conspiracies aimed at interfering with rights that are protected against private, as well as official, encroachment. *Tilton*, 6 F.3d at 686. The Supreme Court has recognized only two rights as protected against private conspiracies under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel, both under the Thirteenth Amendment. *Id.* (citation omitted). Summary judgment on Mr. Duran's § 1985(3) claim was properly granted.

The judgment of the district court is AFFIRMED.

Entered for the Court

David M. Ebel
Circuit Judge