**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 10, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KARON R. ROBINSON, an individual,

      Plaintiff - Appellee / Cross -
Appellant,

v.

CAVALRY PORTFOLIO SERVICES,
LLC, a foreign limited liability company,

      Defendant - Appellant / Cross -
Appellee.

Nos. 08-5020 & 08-5022
(N.D. Okla.)
(D.C. No. 4:05-CV-00727-GKF-FHM)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **GORSUCH**, and **HOLMES**, Circuit Judges.

      KaRon Robinson (KaRon) filed a Title VII suit claiming her employer, Cavalry

Portfolio Services, L.L.C. (Cavalry), discriminated against her because she is a white

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

woman married to a black man, Orlando Robinson (Orlando).[1] KaRon represented

herself at trial. The jury returned a verdict in her favor on claims of disparate treatment,

retaliation and hostile work environment. Cavalry appeals from the district court's denial

of its motion for a directed verdict on KaRon's claims and, in the alternative, the denial

of Cavalry's post-trial request for a new trial based on KaRon's conduct during her self-

representation. KaRon cross-appeals from the district court's grant of a directed verdict

to Cavalry on her constructive discharge and punitive damages claims. We reverse and

remand for the district court to enter a directed verdict for Cavalry on KaRon's

discrimination, retaliation and hostile work environment claims.

## I.  FACTUAL BACKGROUND[2]

Orlando and KaRon both worked at the Cavalry office in Tulsa, Oklahoma.

Orlando began working at Cavalry in December, 2003. He recruited his wife to apply for

a job and she began her employment with Cavalry on July 26, 2004.

A. Cavalry's Business Operations and Payment Structure.

Cavalry is a debt collection service agency. Its home office is located in Phoenix,

Arizona, with satellite offices in St. Paul, Minnesota and Tulsa, Oklahoma. Collection

specialists (specialists) such as KaRon are assigned delinquent accounts to try to collect.

The original distribution of accounts is automatically sent to the individual specialist's

queue by the portfolio managers in the Phoenix office, usually within the first ten days of

---

[1] We use the Robinsons' first names for clarity and ease of expression.

[2] These facts were not contested at trial.

the month.[3]  On the collection floor, specialists are placed in "teams" under one manager who, in turn, reports to a manager/director.  If a specialist does not receive an adequate amount of accounts, it is the manager's responsibility to go to a director to ask that Phoenix be notified of the situation.  Managers do not work individual accounts, but receive commissions based on the collections of the people on their team.  Some specialists who work "manual" accounts (meaning the specialist manually dials the phone rather than having a computer automatically dial their next account) have access to a computer program, called "skip tools," to research and correct debtors' invalid telephone numbers or addresses.

Collection accounts differed in the amount owed and in the difficulty in successfully negotiating repayment.  During a new employee's training, Cavalry "[g]enerally . . . focused on the newer people working smaller balanced accounts [approximately $500.00] . . . [because] the [training specialists] didn't have skip tools." (Vol. II at 652.)  Specialists could accept several forms of payment from the debtors. One form was post-dated checks.  Another was an Automatic Clearinghouse payment (an ACH).  This is an agreement from a customer to automatically pay monthly from his or her bank account.  The advantage for the customer is he or she pays no interest.  The benefit for the collection specialist is the monthly payment goes toward his or her commission every month without having to follow up with the customer.

---

[3]  There was some testimony that, at one time, Tulsa management had control of the distribution of accounts to its office.  However, there was no testimony that this control was in effect during KaRon's employment.

Specialists could also "exhaust" an account because it was uncollectible. The specialist's computer screen allowed them to designate one of three different reasons to exhaust: unable to locate a customer after a diligent search; customer unable to pay; and the customer's absolute refusal to pay. When an account is exhausted, the collector presses a button on the computer and the account is forwarded to the collector's manager's queue to either be sent on as uncollectible or, if the specialist is exhausting too many accounts, sent back to the specialist for them to try contacting the debtor again.

A major potential source of income for a collections specialist is the commission received on paying accounts. The commission percentage is based on a scoring formula derived from different factors relating to a debtor's propensity to pay on the account and the availability of state laws to enforce collections. The Phoenix office assigns a higher commission rate on more difficult accounts. For example, if the debtor was located in a state where the laws were not favorable to suit, the commission rate would be higher. If the specialist discovered the current address of the debtor had changed to a different state with a lower rating factor, the commission would be changed as well. The commission for each payment was applied to the specialist's monthly goal – an amount calculated from the specialist's pay rate and the number of hours worked each month. As a specialist's negotiated payments reached incremental levels approaching her goal, such as 50%, 75% and 100%, she would receive increasing bonus payments.

B.     KaRon Robinson's Employment

    1.     Academy Bay

    At the time KaRon was employed, all new employees were assigned to work in

the training unit known as Academy Bay, an experimental training program initiated in May or June 2004. Upon completion of certain criteria, an employee would "graduate" to the floor and receive an assignment to a collection team. Rhonda Bemore was the manager of Academy Bay and the direct supervisor of approximately twenty new employees. Bemore's supervisors were Andrew Brown, Vice-President of Tulsa operations, Mickey Warren (title unknown) and Mike Madewell, Site Manager and "for a period of time," Academy Bay Director. (Vol. II at 769.) Madewell determined who would graduate to the floor with input from Brown and Bemore. While in Academy Bay, KaRon complained to Brown about Bemore's supervision claiming "she was a little more strict or a little more harsh than she should be, that she didn't get [KaRon's] letters done very efficiently, [and] that she didn't answer [KaRon's] questions in a professional manner." (*Id.* at 638.)

2. Racial Incident

On October 21, 2004, Kim Cooper, a Cavalry employee in Academy Bay, approached Bemore to report an incident in the lunch room regarding race. Bemore asked who was involved and Cooper named KaRon and Mark Torres. Bemore relayed the report to Madewell who summoned KaRon and Torres for interviews and to give written statements. Madewell spoke with KaRon first. She wrote the following statement:

> Mark and I were having lunch and Mark politely asked me if I only dated black guys like Mariza did. I told him no I was attracted to both I just happened to end up [with] one of a different race. He responded [with] the fact that he would never date someone of another race, he just couldn't stand having to listen to them complain about the whole slavery topics. He

- 5 -

thought they used it as a crutch.  Mark continued to express that he's not a racist that he just didn't really like blacks until he got to know them. Which is fine however there were several times he used the word "Nigger" while referring to them.  He explained that he just didn't like the fact that they can call each other by that word but he can't call them that.  I'm pretty sure he wasn't using the term neg[atively] he was just using the term to describe a certain situation.  However there were several people in the breakroom and I'm sure they over-heard him using the term.  I did [talk to] him outside after lunch bec[ause] I was offended and Mark explained to me that he was using the word to explain himself in that situation but he wasn't calling anyone here that.  He apologized to me for even using the term and I explained to him that I understood if he felt that however work is not the place to discuss it.  He had also made a comment that he didn't have black in his bloodline because if he did he would be scraping that sh_t off.  I told him that was a very racist thing to say and once again he cont[inued] to explain that he has black friends, and he's not a racist.

(Vol. IV at 1589-90.)

Torres was interviewed next.  He wrote in relevant part:

First of all I have to say that I am naturally a jokster [*sic*] and I am always joking around with people, this is just who I am.  Jokingly I [said] to KaRon "if you leave your husband are you going to find you a good looking white guy."  Obviously, I guess she got offended by me saying that and she said kind of inquizitively  [*sic*] "Are you prejudiced?"  I said "No of course not, I was just curious."

Then me being the jokster [*sic*] that I am trying to be funny I was asking my buddy Adam "why is it the black guys in my team can say "whats up my nigga" to each other but if we said it we would get hurt."  I was just giving my opinion in a funny way but because the N word was used, even thought it was not directed at anyone, and even though if I happened to be black I would not be writing this right now, it should not have been said.

My Opinion – I want to apolige [*sic*], but I would also like to say I really don't think its right that the N-word is [said] almost on a daily basis by some of the black humans that work at this site.  But because I [said] this word, even though it was not directed at anyone and I would never direct that word to anyone, that I am sitting here under question because I am not African American.  When I hear African Americans say this word daily.

I want to reiterate the word was not [said] towards anyone it was used in the tense [*sic*] of asking a question.  Thats it thats the bottom. [*sic*] Why,

because Mark Torres says so!

(*Id.* at 1591-92.)

After reading Torres' statement, Madewell also interviewed Adam Aven who wrote:

> During lunch in the break room (east break room) myself, Mark T. and the young lady were visiting together while we ate. She asked Marc for his opinion [and] or thoughts on a particular subject [and] he proceeded to tell her. Some of his views probably sounded "racial" in nature, but in reality probably weren't. But the way she perceived them may have offended her.

(R. Vol. IV at 1588). Madewell gave Torres a verbal warning that his conduct would not be tolerated and any further similar conduct would lead to disciplinary action, including termination. Madewell then delivered the written statements to Vicki Arnold, the on-site human resources representative. In turn, Todd Tipton, director of human resources in Phoenix, was made aware of the statements.

Two days later, Torres was terminated for excessive tardiness. Apparently believing his statements to KaRon were at least a partial cause of his lay off, Torres was waiting in the parking lot when KaRon and Orlando left work that evening. Torres shouted insults and threats. The Robinsons were asked to come back inside the building while someone else went outside to tell Torres he must leave or the police would be called. Torres left.

3.      David Shaw's Unit

Academy Bay was discontinued at the end of December 2004 and the specialists remaining in Academy Bay were assigned to floor units. KaRon was assigned to David Shaw's unit. While in Shaw's unit, KaRon complained about the amount of accounts she

received. The same complaint, however, was voiced by many specialists. She also informed Shaw she was having problems with her computer but nothing was done about it. On April 20, 2005, without explanation, KaRon telephoned to submit her resignation. Orlando resigned the same day.

According to KaRon, her resignation was caused by her treatment after the Torres incident. She claimed Cavalry gave her fewer and less lucrative accounts, had her commissions lowered and told her she could not be seen with her husband even though other couples were free to mingle. She also claimed she was not promoted out of Academy Bay when other less competent employees graduated to the floor. She alleged she was subject to verbal abuse and inequitable disciplinary measures by her supervisors and the conditions of her work forced her to resign.[4]

## II. PROCEDURAL BACKGROUND

A. Pretrial

KaRon filed a claim with the Equal Employment Opportunity Commission on June 13, 2005, and on September 28, 2005, she received a notice of right to sue. She filed her lawsuit on December 22, 2005, raising three claims: sexual discrimination, retaliation and hostile work environment pursuant to Title VII of the Civil Rights Act of

---

[4] KaRon's anger and her intention to sue Cavalry at the time she resigned are not disputed. Before leaving her employment, KaRon copied and retained numerous Cavalry documents containing client information. During re-direct examination of David Shaw, she asked, "So you don't think it's fair that [I] secured the information to show . . . mistreatment?" (Vol. II at 739.) On her last day, she transferred 50 to 75 of her accounts to the "Spanish bin," where the accounts would be assigned to a specialist proficient in Spanish. In her questions to Shaw, she stated she did this in an attempt to prevent Shaw from receiving any commission on those accounts.

1964, 42 U.S.C. § 2000e *et seq.*, seeking actual, compensatory and punitive damages. At some point KaRon abandoned her sexual discrimination claim. The pre-trial order identifies the issues as: "1.) race discrimination [based on racial association]; 2.) hostile work environment; and 3.) retaliation which ultimately resulted in her constructive discharge." (R. Vol. I at 37.)

B.      Trial

The jury trial began on April 18, 2007, and continued through April 24, 2007. KaRon called Bemore, Brown, Madewell and Shaw to testify as hostile witnesses. She also called black co-employees Vince Brinkley, who worked with her in Academy Bay, and Kari Kiger, a co-worker in David Shaw's unit. In addition, KaRon presented testimony from her husband (a manager-in-training) and Gregory Kent Mitchell, another manager-in-training.

After KaRon presented her case, Cavalry moved for judgment as a matter of law on all claims. The district court took the motion under advisement. At the completion of all evidence, Cavalry renewed its motion. The district court granted a directed verdict to Cavalry on KaRon's constructive discharge and punitive damages claims, but allowed the jury to determine her discrimination, retaliation and hostile work environment claims.

C.      The Verdict and Post-Trial Motions

The jury returned with a verdict in KaRon's favor on her discrimination, retaliation and hostile work environment claims, awarding her $150,001 in compensatory damages and $150,000 in back pay. Both parties filed post-trial motions. KaRon requested over two million dollars in future damages based on the jury's finding she was

subject to a hostile work environment which prevented her successful career at Cavalry. Cavalry filed a renewed motion for judgment as a matter of law claiming KaRon failed to establish her prima facie case, and even if she did, she failed to show Cavalry's business reasons for its actions were pretext. Cavalry also filed a motion for a new trial claiming KaRon's emotional outbursts and improper questions tainted the trial's outcome. The court granted Cavalry's motion for a new trial solely on the back-pay damages. The remaining post-trial motions were denied.

Following a new trial on back-pay damages, the court reduced the jury's award from $150,000 to $12,141.71 including interest.[5] Cavalry appeals from the denial of its motions for either a directed verdict or a new trial. KaRon cross-appeals from the directed verdict on constructive discharge (including future damages) and the denial of punitive damages.

### III. DISCUSSION

A.    Waiver

As an initial matter, KaRon maintains Cavalry waived all but one of its arguments on appeal because it failed to raise the other issues when making its pre-verdict motion for a directed verdict.[6] "To preserve a sufficiency of the evidence claim for appellate review, a party must move for judgment as a matter of law (directed verdict) under Federal Rule of Civil Procedure 50(a) at the close of the evidence . . . . Motions under Rule 50 must 'specify the judgment sought and the law and the facts on which the

---

[5] KaRon was represented by counsel at the damages trial before the district court.

[6] KaRon does not specify exactly which argument she believes was preserved.

moving party is entitled to the judgment.'" *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir. 2000) (quoting Fed. R. Civ. P. 50(a)(2)). Rule 50(a) may not be circumvented "by raising for the first time in a post-trial motion issues not raised in an earlier motion for directed verdict." *Id.*

Cavalry maintains the issues were raised at the proper time but, in any event, KaRon waived her challenge by failing to raise it in the district court. *See Guides, Ltd. v. Yarmouth Group Prop. Mgmt. Inc.*, 295 F.3d 1065, 1076 n.3 (10th Cir. 2002) ("When the non-moving party fails to raise the inadequacy of a Rule 50(a) motion in opposition to a Rule 50(b) motion, that party cannot raise waiver as an argument on appeal."). Given KaRon's waiver of her argument, we consider all issues determined by the district court.

B. Sufficiency of the Evidence

We review the district court's denial of a Rule 50(b) motion for judgment as a matter of law de novo, applying the same standard as the district court. *Id.* at 1073. We review the entire record and construe the evidence with all reasonable inferences in the light most favorable to the nonmoving party. We do not make credibility determinations or weigh the evidence. *Id.* Judgment as a matter of law is appropriate "only if there is no legally sufficient evidentiary basis for the claim." *Id.*

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 148 (2000). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination,

- 11 -

and it may be quite persuasive." *Id.* at 147; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.
>
> \* \* \* \*
>
> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves*, 530 U.S. at 148-49.

1.  Retaliation

KaRon claims Cavalry's discriminatory actions were in retaliation for her report of the Torres incident.[7] The relevant anti-retaliation provision states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

---

[7] Actually, she was not the reporting party, but did supply a statement.

Establishing a prima facie case requires a plaintiff to show "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (footnote omitted). "[T]he antiretaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Instead, the plaintiff must demonstrate a reasonable employee would have found the challenged action materially adverse, which means "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. "A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (quotation omitted). Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time. Otherwise, "the plaintiff must offer additional evidence to establish causation." *Id.*

Cavalry argues KaRon's retaliation claim must fail because she did not engage in a protected activity when she wrote her summary of the Torres incident. It argues she did not initiate a complaint and the content of her statement did not notify Cavalry she was opposing an employment practice in violation of Title VII. KaRon claims it makes no difference whether she initiated the complaint against Torres. Because Cavalry does not

- 13 -

dispute it knew Torres made allegedly racist remarks to KaRon in the presence of other employees, her report regarding the incident clearly opposed Torres' conduct.

KaRon is correct that she need not have initiated the complaint to management to come within the statute's protection. In *Crawford v. Metro. Gov't. of Nashville & Davidson County, Tenn.*, the Supreme Court held:

> [A] person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.

129 S. Ct. 846, 851 (2009). However, she misperceives what constitutes an unlawful "employment practice." A complaint of a single racist remark by a colleague, without more, is not "opposition protected by Title VII." *Jordan v. Alternative Res., Corp.*, 467 F.3d 378, 380 (4th Cir. 2006).

> As the law stands, Title VII does not create a claim for every employee who complains about the potential for Title VII violations or about other employees' isolated racial slurs. It protects an employee who opposes 'any practice made an unlawful employment practice,' 42 U.S.C. § 2000e-3(a), or who 'reasonably believes' he is opposing a practice made an unlawful practice by Title VII.

*Id.* "The employer must know not only that the employee has opposed *an action of the employer* . . ., but that the opposition was based on a belief that *the employer's action* constituted discrimination prohibited by Title VII (here, racial or national-origin discrimination)." *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009) (emphasis added).

In *Clark County Sch. Dist. v. Breeden*, a female employee claimed retaliation after

she met with her male supervisor and another male co-employee to review psychological reports for four job applicants. In one applicant's report, the applicant had stated to a co-worker, "I hear making love to you is like making love to the Grand Canyon." 532 U.S. 268, 269 (2001) (per curium). "The supervisor read the comment aloud, looked at the female employee and said, 'I don't know what that means.' The other employee then said, 'Well, I'll tell you later,' and both men chuckled." *Id.* The female employee complained about the remarks to the supervisor and two assistant superintendents. Reversing the Ninth Circuit, the Supreme Court upheld the dismissal of the employee's retaliation claim, concluding that "no one could reasonably believe that the incident . . . violated Title VII." *Id.* at 270.

The Court explained: "Title VII forbids actions taken on the basis of sex that 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.'" *Id.* (quoting 42 U.S.C. § 2000e-2(a)(1)). "Hence, a recurring point in [Supreme Court] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 271 (quotations and alterations omitted). Thus, the Court "implicitly reject[ed] any interpretation of Title VII which would permit a plaintiff to maintain a retaliation claim based on an unreasonable good-faith belief that the underlying conduct violated Title VII." *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003). "[T]he absence of a reference to unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has

- 15 -

opposed or is opposing a violation of Title VII." *Petersen v. Utah Dep't of Corr.*, 301

F.3d 1182, 1188 (10th Cir. 2002).[8]

No reasonable person could have believed that the single Torres incident violated

Title VII's standard. It is undisputed the employees' reports, including KaRon's, do not

claim Cavalry did anything wrong. They state a co-employee made a racial slur. In the

words of the Fourth Circuit: "[N]othing in our ruling condones the contemptible

comment made by the coworker in this case . . . . [But] complaining about an isolated

racial slur is not opposition protected by Title VII." *Jordan*, 467 F.3d at 380. Thus,

KaRon failed to establish her prima facie retaliation case.

2.    Disparate Treatment

Title VII's anti-discrimination provision states:

It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's race,
color, religion, sex, or national origin; or

---

[8] *See also Pope v. ESA Serv's, Inc.*, 406 F.3d 1001, 1010 (8th Cir. 2005) (in Title VII retaliation case, employee's comments about the absence of black managers did not constitute protected activity because employee failed to attribute the absence of managers to racial discrimination); *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 615 (8th Cir. 2003) (ADEA plaintiff's letter-writing campaign accusing employer of improper loan procedures was not protected activity because the letters were not written to oppose age discrimination); *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216-17 (4th Cir. 2002) (physician's ADA retaliation claim failed because her opposition to her employer's treatment of dialysis patients was based on violations of state medical malpractice law and not the ADA); *Barber v. CSX Distrib. Serv's.*, 68 F.3d 694, 701 (3d Cir. 1995) (employee's ADEA retaliation claim failed because employee's criticism of employer's selection of a less qualified, younger applicant for a job, without specifically complaining about age discrimination, did not constitute protected conduct).

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

In a disparate treatment case, the plaintiff must show "(1) that [s]he is a member of a racial minority, (2) that [s]he suffered an adverse employment action, and (3) that similarly situated employees were treated differently." *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).[9] Cavalry argues KaRon failed to produce evidence that she suffered an adverse employment action or similarly situated employees were treated differently. Moreover, she failed to demonstrate Cavalry's

---

[9] The evidentiary basis for the district court's determination that KaRon presented sufficient evidence to establish her disparate treatment claim and pretext is hazy. After the hearing on the post-trial motions, the district court orally ruled it would rely on the reasons stated in its written order denying the motion for a directed verdict to hold "that based on the evidence adduced at trial a reasonable jury would have had a legally sufficient evidentiary basis to find for the plaintiff with respect to her claims of disparate treatment, hostile work environment and retaliation." (R. Vol. III at 1518.) The court then stated: "Certain of defendant's explanations given were such that I think plaintiff failed to show that some of those business reasons were pretextual . . . . So at least with respect to that one ACH . . . plaintiff failed to show that Ms. Bemore's actions [reissuing the ACH] were pretextual. I don't believe, though, that . . . . I heard a sufficient business reason given with respect to the low number of accounts and even if it is ultimately determined that the record does support that, I do believe that plaintiff adduced sufficient evidentiary support to show that the business reason for the low number of accounts was pretextual. Then we get into the temporal proximity and I think the record should reflect I remember many, many arguments about temporal proximity on the record here at trial." (*Id.* at 1518-19.)

The court's written order gives no rationale or examples from the evidence at trial explaining its denial of the directed verdict other than stating the retaliation claim was supported by "the fact that she did . . . complain." (R. Vol. I at 107.)

- 17 -

business reason for the number of her accounts was pretext.

### a) *Adverse Employment Action*

"Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006) (quotation omitted). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (quotation omitted). KaRon asserts the evidence established three adverse employment actions: (1) Cavalry failed to promote her out of Academy Bay while promoting less qualified candidates; (2) she was given a lower number of accounts and/or lower quality accounts to prevent her from reaching her goals and receiving commissions; and (3) her commission rates were inappropriately lowered while she worked with Shaw's team.

### (1) Failure to Promote

KaRon introduced a report listing Academy Bay employees' post-dated check amounts for an unspecified month. Although KaRon had the most checks and the largest amount of payments, several of the other employees on the report were moved from Academy Bay to a floor unit before KaRon. KaRon also introduced six "report cards" from September through December 2004. The report cards were issued daily to notify

the Academy Bay trainees of their progress. Each assessed KaRon as a "strong performer" and one classified her as an "elite" performer. (R. Vol. II at 668-69.) Orlando testified a Cavalry manager, Darrell Bunch, told him "[KaRon's] the best collector in [Academy Bay]" and Bunch was trying to get her on his team but Brown and Tipton said "she wasn't ready" and "to pick someone else." (*Id.* at 891.) He also testified Bunch stated "[he did not] know why they're intentionally holding her back." (*Id.* at 892.)

Bemore testified a collector would graduate if her work was consistent and met five criteria in one month. The exact requirements were often modified but, at one point, the requirements included: (1) negotiate five payment arrangements; (2) negotiate five settlements; (3) complete three ACH forms; (4) achieve 35% of the specialist's monthly goal and average 150 calls daily; and (5) negotiate five post-dated accounts for at least $1,000 gross. Bemore agreed KaRon was focused, professional and "showing consistency." (*Id.* at 524.) She testified KaRon helped train a newer employee, Kim Cooper, who graduated before KaRon. When KaRon asked why Cooper graduated from Academy Bay, Bemore responded, "Kim must have hit all of her criteria or she wouldn't have graduated." (*Id.* at 522.) Bemore stated she thought KaRon met several of the criteria each month but did not "think that [KaRon] hit every single piece of the criteria." (*Id.* at 513.)

Madewell testified management decided to retain some more experienced workers within Academy Bay so the floor managers would be assigned seasoned as well as new specialists. At least ten collectors were in Academy Bay when it closed at the end of

December 2004.  Three of the collectors had been employed longer than KaRon -- Vince Brinkley, Judy Riley and Kathy Norton.  Brinkley was listed as the number one Academy Bay employee on one of the report cards introduced by KaRon and number three on another.  Riley was listed as number two.

After careful review of the evidence, we must conclude KaRon failed to show she was treated differently than other employees in regards to her promotion or that the business reasons proffered by Cavalry were pretext.  While KaRon demonstrated she was very successful in some aspects of her work, she simply did not prove she had met the graduation criteria in a single month.  There was no testimony or documentary evidence demonstrating other employees had graduated without meeting all the criteria.  In addition, KaRon's exhibits demonstrated that equally qualified employees, such as Brinkley, also remained in Academy Bay through December 2004.  Although Bunch told Orlando he believed KaRon was the best worker in Academy Bay, there is no evidence Bunch was involved with Academy Bay decisions or that he knew the relative abilities of all the Academy Bay employees.

(2) Commission Rates

KaRon claimed Cavalry's discrimination against her also included the lowering of her commission rate after she had made arrangements for payments.  She introduced printouts of accounts in which her commission rate was lowered from its original level.  However, Mitchell and Bemore testified they too had commissions on paying accounts lowered; some were changed back but others were not.  Bemore stated if the employee notifies his manager and there was a mistake, the rate was changed back.  KaRon then

asked: "Have you ever heard of anyone at Cavalry other than myself have a commission rate changed and nobody change it back to the previous commission rate?" (Vol. II at 502.) Bemore responded: "To my knowledge, they're supposed to be changed back . . . . As an employee now, I notify my direct report which is Andrew Brown and he sends an e-mail and then he gets back with me and then it's rectified." (*Id*.)

Mitchell and Brown reiterated commissions were changed on paying deals and the employee must bring the problem to the attention of a manager, who would then check with the Phoenix office to determine the reason for the change. KaRon presented no testimony that she requested Shaw investigate a commission change and even KaRon's questions did not imply she asked to have her commissions reinstated to their original level. Moreover, many of the exhibits showing a decreased commission occurred while, according to Orlando, his wife was getting along well in Shaw's unit. Thus, the jury was given no factual basis to reasonably conclude KaRon was treated differently than other similarly situated employees when her commission rate changed or that the business reason for the change was pretext.

### (3) Number and Quality of KaRon's Accounts

KaRon claimed she was given fewer and less workable accounts than others after the Torres incident. Vince Brinkley testified on one occasion, at some point in time, KaRon showed him she had only 79 accounts in her queue. Brinkley stated the number was not appropriate and he had no less than 800 to 900 accounts in his queue. Orlando recounted a manager's meeting he attended when Bemore told Madewell KaRon did not

have any accounts.[10] When Orlando asked why, Madewell told him "well, I did it for a reason but I'll talk to you about it later." (*Id.* at 887.) In addition, Orlando stated his wife had shown him accounts missing from her queue with Bemore's initials on them, implying Bemore somehow inappropriately moved these accounts.

Gregory Mitchell testified the Robinsons complained to him that KaRon was not treated fairly in the distribution of accounts and Bemore was not properly scanning KaRon's ACH accounts into the system. Mitchell reported these complaints to Brown and Warren, but he did not recall what happened to the reports.

KaRon submitted several printouts showing the number of her accounts on four dates while she worked in Shaw's unit. The printouts showed: on January 28, 2005, KaRon had a total of 218 accounts; on January 31, 2005, a total of 191 accounts; on February 2, 2005, a total of 190 accounts; on February 3, 2005, a total of 147 accounts; and, on April 13, 2005, a total of 211 accounts. Mitchell testified it would be possible for a specialist to hit her goal with these numbers but unlikely if the accounts were less than $500.00. Kari Kiger testified that when she worked with KaRon in Shaw's unit, KaRon asked Shaw for more accounts because she only had 300. Kiger said Cavalry managers had said "they could get [accounts] for [Kiger] personally" if she "didn't have enough accounts." (Vol. II at 861.) However, "to [Kiger's] knowledge" nothing was done about KaRon's number of accounts. (*Id.* at 858.)

---

[10] One may wonder why Bemore would notify Madewell that KaRon needed more accounts if Bemore was deliberately reducing her accounts to insure KaRon's failure.

KaRon also claimed Bemore discriminated against her by returning unworkable accounts to her queue. KaRon submitted 52 printouts of her computer screen showing accounts she had "exhausted" as uncollectible which Bemore returned to her queue to "rework" between the end of November through December 2004. Orlando testified that on "several" of those accounts "[t]here was nothing more that could be done with the account and they were given back to [KaRon]. There were bankruptcies that legally we cannot call, deceased accounts, people who are dead, you can't collect[] from them because they are deceased." (*Id.* at 888.)

Cavalry maintained the managers at the Tulsa office did not participate in the distribution of accounts. Brown, Shaw, Madewell and Kiger all testified the number of new accounts for each specialist was determined by the Phoenix office.[11] While Shaw stated he believed Warren had access to distribute accounts "at one time," he did not testify when this occurred. (*Id.* at 716.) Orlando testified "at one particular time [disbursement] did get switched to Phoenix, but when I was there at one time this Tulsa office had control of distribution." (*Id.* at 896.) Neither Orlando nor Shaw testified Tulsa distributed the accounts from October 2004 through April 2005, the time period KaRon claims she was discriminated against.

Testimony regarding who had the ability to transfer accounts after assignment was, at best, confusing. It is uncontested the managers could move accounts back to a specialist to rework. Madewell marked one of KaRon's accounts for "rework." (*Id.* at

---

[11] Brinkley was unsure, but assumed the Tulsa office distributed the accounts because "someone has to do it." (*Id.* at 853.)

977.)  Upper Tulsa management—Brown, Warren and Madewell—could also request more accounts from Phoenix for specialists.  It appears at least one Tulsa employee could move an account upon request from upper management for the purpose of assigning related accounts or for other business reasons.  It was uncontested the number of accounts in a queue could change daily or even within the same day.  Specialists could exhaust an account or move it to the Spanish bin.[12]  Affording every reasonable inference in favor of KaRon, the jury could reasonably believe, at least on certain dates, KaRon received fewer accounts than her colleagues because upper management was not acting as forcefully on her behalf as it did for other specialists.[13]

The next question is whether KaRon provided evidence that the managers' failure to secure more accounts for KaRon altered the terms and conditions of her employment.  Orlando opined he never had less than 500 accounts and "unless you have an adequate number of accounts, you cannot hit your goal consistently . . . .  [I]t's impossible."  (*Id.* at 882.)  But KaRon did not submit evidence regarding her salary, the amount she made on commission or her ability to meet *her* monthly goals.  She did produce disciplinary

---

[12]  By unilaterally moving an account to the Spanish bin, a specialist could artificially reduce the number of accounts in their queue.

[13]  KaRon would have us conclude that the fact the Phoenix office assigned the accounts "only serves to underscore the fact that upper management, including Todd Tipton of the Phoenix office, was in on the decision to, together with Madewell and Bemore, intentionally discriminate against [KaRon]."  (Appellee's Response Br. at 38.)  This conclusion would be based solely on speculation.  There is no evidence Phoenix management, other than Tipton in Human Resources, knew about the Torres incident and no evidence Tipton had any connection to the account distribution department.  KaRon presented no evidence of conspiracy between the Tulsa and Phoenix offices.

reports of verbal warnings given to three other workers for failing to maintain their collections at an acceptable level but no similar reports on her performance. In addition, KaRon presented no evidence showing the number of exhausted accounts returned to her queue were larger than the number returned to other employees. Because KaRon failed to provide evidence that the number of accounts in her queue changed the terms and conditions of her employment, she failed to submit evidence sufficient to establish her prima facie case.

3. Hostile Work Environment

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). A hostile work environment claim requires a plaintiff to show "that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005). Severity and pervasiveness are evaluated according to the totality of the circumstances, considering such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007) (listing factors to be considered in determining whether environment is hostile or abusive). "Facially neutral abusive conduct can support a finding of . . . animus sufficient to sustain a hostile work

environment claim when that conduct is viewed in the context of other, overtly [racially] discriminatory conduct." *O'Shea v. Yellow Tech. Serv's.*, 185 F.3d 1093, 1097 (10th Cir. 1999). "A plaintiff cannot meet this burden by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs." *Chavez*, 397 F.3d at 832 (quotations omitted).

KaRon claims there was no discrimination prior to the Torres incident but shortly thereafter she experienced a significant change in the way she was treated by her supervisors. Looking at the period of time from October 21, 2004, through December 30, 2004, while KaRon was in Academy Bay, Vince Brinkley testified it seemed Bemore and KaRon were "okay" but "all of a sudden" there were "quite a few incidents." (R. Vol. II at 852.) He said he "kind of felt" like Bemore treated KaRon more harshly than other employees and, on one occasion, told KaRon to "sit down and shut up." (*Id.* at 841, 852.) In addition, Brinkley testified Madewell would not answer KaRon's question at an employee meeting even after another employee said "[KaRon] has a question." (*Id.* at 842.) Brinkley stated Madewell "made a reference to [KaRon] being stupid or something like that." (*Id.*)

KaRon claimed Bemore unfairly gave her a written disciplinary action on November 18, 2004. Brown explained he called a meeting with KaRon on November 17, 2004, which Bemore and Warren attended. Bemore was told KaRon was taking her accounts to Orlando to work for her. At that time, the employees on the floor had additional tools to work an account that were unavailable in Academy Bay. Brown told KaRon she could not ask her husband to work her accounts. He separately told Orlando

he could do "a second talk-off,"[14] but could not work KaRon's accounts as it would give her an unfair advantage. (*Id.* at 1066.)

After the meeting KaRon moved her workspace, which had been located next to Bemore's, to another cubicle farther away from Bemore. The managers called KaRon back in because a work station could not be moved without advance permission. The meeting took place in a glass conference room which could be seen by other employees. During this meeting, KaRon became visibly upset and left. She called her husband in tears and told him to bring her the keys in the break room. Orlando testified KaRon told him she had been "ambushed," and to let Bemore know she was outside and could not return to work. (*Id.* at 874) Orlando testified he did so and Bemore "offered to clock her out." The next day, Bemore gave KaRon a written reprimand for moving her workstation without permission and for leaving work without notifying her supervisor. Bemore testified Cavalry's policy required an employee to give notice directly to the supervisor before leaving early from work. In response, KaRon submitted a report recounting an incident during Torres's employment when Torres's wife brought a note stating he was ill but Bemore did not reprimand Torres for failing to call.

Kiger testified there were two instances when she heard negative comments regarding the Robinsons. The timing of these statements was not established. The first comment was made by an unidentified male employee who continues to work at Cavalry.

---

[14] Employees were encouraged to assist each other when a debtor was recalcitrant about payment. Often a second voice may be persuasive, "especially male versus female." (Vol. II at 1066.)

Kiger stated he said, "I personally wouldn't do that [inter-racial marriage] myself but if that makes them happy, good." (*Id.* at 859.) Kiger described the situation as follows: "[Y]ou know, otherwise he wasn't condoning your relationship as you being married but he wasn't going to say that it, he was sugar-coating it . . . I don't know why he wouldn't want you to be married, but for the type of jokes the person makes, I would say it would probably be racial." (*Id.* at 859-60.) Kiger also testified, "[a]t some point in time [Bemore made] a comment to [Kiger] that [Kiger] felt was inappropriate due to [the Robinsons'] interracial relationship." (*Id.* at 861-62.) Kiger did not reveal what Bemore said nor did Kiger testify she relayed these comments to KaRon.

KaRon was transferred to Shaw's unit less than three months after the Torres incident and did not thereafter associate with Bemore. Kiger testified Shaw was occasionally unavailable, "condescending" and "overbearing" to KaRon but she never saw Shaw directly intimidate KaRon. (*Id.* at 862.). Other employees also complained about Shaw's supervision. Orlando testified Shaw was not "hostile" to KaRon "until towards the end." (*Id.* at 891.) He did not testify how Shaw was hostile.

Even when viewing these circumstances with all favorable inferences to KaRon's claims the evidence revealed, at most, an unpleasant work environment. Bemore and Madewell were rude on one occasion. Bemore, known as a harsh supervisor, picked on KaRon. However, on cross-examination, Orlando confirmed no one ever made a negative comment to him about the racial difference between him and his wife. He conceded he never complained that he felt like he was being treated unfairly because of his race and neither Bemore nor Madewell made any comments which would indicate

- 28 -

there was a problem with the fact he was married to a white woman. It is further uncontested that neither KaRon nor her husband told upper management or the human resources department that KaRon believed she was being discriminated against because of her marriage.

Without discriminatory overtones, discourteous treatment is simply not sufficient to impose liability under Title VII. *See Chavez*, 397 F.3d at 833. ("Title VII is not a code of workplace conduct . . . a hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment based on [race].") While KaRon may have believed Bemore was unfair, "this court's obligation is not to mandate that certain individuals work on their interpersonal skills and cease engaging in inter-departmental personality conflicts." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1218 (10th Cir. 2008); *see also MacKenzie*, 414 F.3d at 1280 (courts "should filter out complaints attacking the ordinary tribulations of the workplace").[15]

_____

[15] The jury's conclusion to the contrary is not surprising given KaRon's questions and comments during the trial. KaRon did not testify, but instead accused the witnesses of discriminatory behavior in her questions, implying she had personal knowledge the Cavalry witnesses were lying when they denied the accusations. For example, the following colloquy took place during KaRon's direct examination of Bemore:

> Q. [O]n November 17th, could you please explain to the jury what happened on that day?
>
> A. What day is that?
>
> Q. The day we had a one-on-one meeting and you had told me that I wasn't allowed to be seen or speak to my husband, even on breaks and lunches, because it made other people uncomfortable?
>
> A. I didn't tell you that.

- 29 -

Because the evidence at trial failed to establish KaRon engaged in protected opposition to a discriminatory employment practice or that she suffered an adverse employment action, the district court erred in denying Cavalry's request for judgment as a matter of law. In light of our ruling on the hostile work environment claim, we are confident that the district court was correct in not allowing Ms. Robinson's constructive discharge claim to go to the jury. *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007) ("A constructive discharge claim based on a hostile work environment goes a step farther. An employee is constructively discharged when the employer by his illegal discriminatory acts makes 'working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.'" (citing *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 534 (10th Cir. 1998); *see also Johnson v. Weld County, Colo.*, No.

_____

(R. Vol. II at 566-67.) During Shaw's testimony:

> Q. Did you find it necessary to pull all married couples apart at the same time and put them in separate meetings?
>
> A. I didn't pull any married couples apart.

(*Id.* at 735.). During Brown's testimony she inferred he was lying when he said Kiger had not come to him to relate derogatory comments about her marriage. (*Id.* at 677.) In fact, Kiger never testified she went to Brown. KaRon also asked Mitchell, "Did you ever tell anyone at Cavalry you were going to lie during your deposition?" (*Id.* at 979.) These are just a few examples of the type of "testimony" KaRon was able to present to the jury.

While the court gave a proper cautionary instruction, the mere volume of allegations repeated in the questions (and not substantiated through testimony or other evidence) would have been nearly impossible for the jury to ignore. In fact, no evidence of damages was presented at the first trial other than one comment made as an afterthought in KaRon's closing. She stated, "I forgot this earlier but the back pay that is owed to me after what I made in Nevada is $158,000 for the past two years." (*Id.* at 1118). No other evidence was presented at trial. The jury awarded her $150,001.

08-1365, Slip. Op. at 26 n.6 (10th Cir. Feb. 8, 2010) ("Because Ms. Johnson's facts fail to meet the threshold required for a retaliation claim — a material adverse harm — it follows that those same facts cannot satisfy the higher threshold required for a constructive discharge claim.")  Given our conclusion, we deem the remaining issues on appeal moot.

**REVERSED** and **REMANDED** for entry of judgment in accordance with this order.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge