# IN THE COURT OF APPEALS OF IOWA

No. 21-1438
Filed December 7, 2022

**MIDWESTONE BANK,**
    Plaintiff-Appellee,

**vs.**

**MANOJ KRISHAN, PRITI KRISHAN, and CHRISTOPHER SCOTT LONG,**
    Defendants-Appellants,

**and**

**ZERO ENERGY SYSTEMS, LLC, and CONSULTING ENGINEERS, CORP.,**
    Defendants.

_____

**MANOJ KRISHAN, PRITI KRISHAN, and CHRISTOPHER SCOTT LONG,**
    Counterclaim Plaintiffs,

**vs.**

**MIDWESTONE BANK,**
    Counterclaim Defendant.
_____

Appeal from the Iowa District Court for Johnson County, Kevin McKeever,

Judge.

Appellants appeal various adverse summary judgment rulings.

**AFFIRMED.**


Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellants.

Charles E. Nelson of Ballard Spahr, LLP, Minneapolis, Minnesota, and

Benjamin M. Lange, Independence, for appellee.


Heard by Vaitheswaran, P.J., and Greer and Badding, JJ.

**BADDING, Judge.**

"You do not have to be a financial whiz to know this is horribly bad." That was the assessment from the president of MidWestOne Bank in the aftermath of its failed lending relationship with entrepreneurs Christopher Scott Long and Manoj Krishan for their company, Zero Energy Systems, LLC. The bank loaned Zero Energy millions of dollars to fund the construction and operation of its facility manufacturing prefabricated concrete walls. Long and Manoj guaranteed the loans, as did Manoj's wife, Priti Krishan. Amid construction cost overruns and operating losses, the company's debt ballooned to more than $16,000,000.

The bank sought to collect that debt in March 2018. After Zero Energy filed for bankruptcy protection, the bank focused its collection efforts on Long and the Krishans as guarantors of the loans. The district court granted summary judgment to the bank on its claims for breach of contract and an annuity account the Krishans pledged as security and on the guarantors' counterclaims for breach of contract, interference with contract, fraudulent misrepresentation and nondisclosure, and punitive damages. Long and the Krishans appeal.

I.    **Background Facts and Proceedings**

A.    **Lending Relationship**

The relationship among the parties began in 2012, when MidWestOne Bank and Zero Energy entered into a loan agreement, under which the bank extended credit to Zero Energy in return for a promissory note to repay $5,282,128.80. Long and Manoj—principals of Zero Energy—individually executed commercial guaranties in favor of the bank, making them personally liable for Zero Energy's debt "now existing or hereafter arising or acquired, that [Zero Energy] . . . owes or

will owe [the bank]." In April 2013, the bank entered into a second loan agreement with Manoj and his wife Priti for a non-revolving line of credit to the Krishans to be "utilize[d] . . . as a cash injection into [Zero Energy]," in return for a promissory note to repay $1,380,000.00. This loan was secured by the Krishans' "Fidelity Investments Annuity Contract," which the bank could liquidate upon default and failure to cure. The loan agreement required the Krishans to designate the bank as the primary beneficiary of the account. The Krishans signed a promissory note for this loan and, in February 2014, signed an additional promissory note as a "renewal" of the prior note.

Over the next few years, the bank issued additional loans, the parties refinanced and restructured the borrower obligations to extend the maturity dates, and the bank received additional promissory notes and commercial guaranties. As to the guaranties, Manoj signed a second guaranty in favor of the bank on Zero Energy's debt in December 2014. Again, the document personally guaranteed payment "of the indebtedness of [Zero Energy] to [the bank], now existing or hereafter arising or acquired, on an open and continuing basis." Manoj signed a third continuing guaranty in January 2015. In January 2016, Long signed a second continuing guaranty, and Manoj signed a fourth continuing guaranty.

The maturity dates fell in March 2016. The loans were in default when that time rolled around, but the bank agreed to allow a forbearance and deferment of payment. Believing the company could turn things around, the bank extended more project loans throughout the rest of 2016 and into 2017, all of which fell into default.

Deep in the hole, the parties decided to enter into an amended and restated credit agreement in June 2017, which has come to be known as the "June reset." At this time, Priti signed her first continuing guaranty of the Zero Energy debt, and both Manoj and Priti signed a commercial pledge agreement.[1]  Under the loan agreement, the bank issued three loans to restructure the company's debt, and Zero Energy executed three promissory notes in the amounts of $10,922,648.53 (Term Loan A), $1,071,430.56 (Term Loan B), and $5,000,000.00 (Working Capital Loan).  The Krishans' personal loan was included in this consolidation, becoming a debt of Zero Energy.  Each note was secured by a mortgage; the commercial guaranties provided by Long, Manoj, and Priti; commercial pledge agreements executed by the Krishans; and separate security agreements.

## B.    Commencement of Litigation

In March 2018, the bank filed a "petition to foreclose mortgage, appoint receiver and enforce guaranties" against Zero Energy, Long, and the Krishans. The petition alleged the defendants were in default of the loan documents and in breach of the overall credit agreement, the separate security agreements, the Krishans' pledge agreements for the $1,380,000.00 in the Fidelity account, and the mortgage, none of which were cured despite service of notice of default and demand for cure in January 2018.  The total outstanding amount due, according to the petition, was $16,240,759.76, which the bank sought to collect through the following counts: (1) breach of contract by Zero Energy; (2) breach of contract by Long and the Krishans; (3) foreclosure; (4) receivership; and (5) through (8) being

---

[1] Manoj had previously executed a commercial pledge agreement in January 2015.

requests for declaratory relief, prejudgment attachment, replevin,[2] and a temporary injunction as to the Fidelity account.

A few weeks after the bank filed its petition, Zero Energy filed for bankruptcy, staying the action as to the company. Long then answered the petition, alleging as affirmative defenses that he "was induced by fraudulent misrepresentations and nondisclosures to enter into the guaranty securing the notes" and "enforcement of the guaranty is barred by equitable estoppel." He also alleged Zero Energy had defenses that would "relieve or reduce [his] guarantor obligation."

For his counterclaims, Long asserted the bank refused to negotiate with Zero Energy on its desire to restructure the debt by using venture capital groups. Instead, bank representatives proposed internal loan restructuring that they said would be beneficial to the company but that Long alleged had the undisclosed "primary purpose . . . to make it appear that the loan would be performing . . . to enhance their ability to collect bonuses or compensation . . . , and not for the purpose of benefiting [Zero Energy]." Long also alleged these same bank representatives arranged for another bank customer to lend funds to the company "to avoid adverse reporting at the end of the quarter" and engaged in other nefarious acts, along with initiating default absent lack of payment under the notes and prematurely liquidating collateral. So Long pled the following counter-claims: (1) fraudulent misrepresentation or nondisclosure based on actions of bank representatives, (2) a claim that the loan and security documents are non-

---

[2] Count seven for replevin was later stricken.

enforceable due to count one, (3) interference with contract between Zero Energy and venture capitalists, (4) breach of contract due to the bank's acceleration, and (5) punitive damages. The Krishans' later answers and counterclaims echoed Long's. The bank replied, denying the allegations.

On the bankruptcy side of things, the parties entered into a stipulated order terminating the automatic stay as to the bank after the bankruptcy trustee "determined that the bankruptcy estate has no equity in the Collateral." The bankruptcy court accordingly authorized the bank "to proceed with its contractual and state law remedies to foreclose on its Collateral, including the real property, fixtures, and personal property as described in the Loan Documents."

Once notified the stay was lifted, the court granted the bank's request for a receiver. By this point, in August 2018, Zero Energy had ceased operations. In September, the court granted the bank's application for a temporary injunction, which prohibited the Krishans from withdrawing funds from the Fidelity account. In April and May 2019, Manoj and Long were granted leave to amend to file a cross-petition. The cross-petition named bank representatives Charles Funk, Chase Stafford, and Kent Jehle as third-party defendants, and made claims for indemnification based on the representatives' alleged acts, interference with contracts Zero Energy had with outside parties, interference with potential contracts, fraudulent misrepresentation, and acting in concert. However, the cross-petition, as amended, was later dismissed by the district court.[3]

---

[3] Long and the Krishans have not appealed that ruling.

**C.      MidWestOne Bank's First Motion for Summary Judgment**

The bank filed its first motion for summary judgment in February 2020, seeking dismissal of all counterclaims by Long and the Krishans.  The bank argued Long and the Krishans "lack standing to assert claims based upon alleged injuries suffered in their capacity as principals and guarantors of Zero Energy."  The bank also argued their claims were expressly waived in the loan documents and failed on the merits.

In resistance, Long and the Krishans preliminarily claimed the bank's motion should be denied because it was "not properly supported" and did not "generate the absence of genuine issues of material fact."  On a more specific level, Long and the Krishans argued their claims are distinct from those of Zero Energy, the breach claim is in dispute because the bank "had no basis to claim default," a finding that there was no interference "lacks any evidentiary support," the loan documents do not waive fraud claims, and the claims do not fail as a matter of law. They then submitted a robust statement of facts in support of their resistance.[4]

In its ruling, the district court found genuine issues of material fact remained as to whether Long and the Krishrans' claims were separate from Zero Energy. The court also found summary judgment based on alleged waiver of claims in the loan documents was improper given the allegations of fraud, which were the subject of remaining issues of material fact.  But the court was "not persuaded that the guarantors have set forth evidentiary facts showing the existence of a genuine issue of material facts on the . . . breach of contract and tortious interference with

---

[4] The statement itself is 138 pages.  The exhibits filed with the statement total about 1000 pages.

contract counterclaims" and granted summary judgment on those claims. Finally, the court found the remaining questions of fact on the fraud claims also generated genuine issues of material fact on the issue of punitive damages. Long and the Krishans moved to enlarge the court's findings, which the court denied.

### D. Competing Motions for Summary Judgment—Fidelity Account

At the same time they moved to enlarge, in October 2020, the Krishans filed a motion for summary judgment on the bank's claims to the Fidelity account, arguing the bank lacked any legal interest in the account. The motion and supporting documents asserted the account is an annuity governed by Texas law, the terms of the account render it not assignable or transferrable, it is exempt from attachment, and it cannot be pledged as security. The bank responded with its own motion for summary judgment on the Fidelity account claims. There being no dispute that the account was pledged as security and is governed by Texas law, the bank asserted Texas law allows the account to be pledged as security.

Following more competing filings on summary judgment between the parties, the district court granted the bank's motion and denied the Krishans' motion. The court found the undisputed facts showed the Krishans designated the bank as the 100% beneficiary of the account in 2013 and, as a result under Texas law, the benefits of the account inure to the bank. So the court declared the bank could liquidate the account.

The Krishans sought a stay and enlargement of the court's ruling, seeking to restrict the bank's access to the account until final disposition. The court granted the stay. In a later supplement to their motion to enlarge, the Krishans argued Texas law voids an attempt to pledge the account as security where the contractual

terms of the policy prohibit the same. In its resistance, the bank argued the statute the Krishans relied on is inapplicable. The court later, in its ruling on the bank's third motion for summary judgment, denied the Krishans' motion for enlargement of findings.

### E. MidWestOne Bank's Third Motion for Summary Judgment

Meanwhile, in May 2021, the bank filed its third motion for summary judgment, this time seeking judgment on Long and Krishans' remaining counterclaims—fraudulent misrepresentation relating to the 2017 credit agreement and punitive damages—because the guarantors' obligations pre-date the June 2017 reset. In other words, the bank argued the guarantors' obligations would still exist despite any alleged fraud with the June 2017 credit agreement. The bank also argued the fraud and punitive damages claims were based on allegedly inaccurate representations that the June reset would be beneficial to Zero Energy. Because there was no genuine issue of material fact that the guarantors did benefit from the June reset, the bank argued summary judgment was proper on those claims. Long and the Krishans resisted.

In its ruling, the court noted that in a previous order, it had found there was no evidence that the bank "or its representatives made misrepresentations or otherwise induced the guarantors into entering the loan agreement." The court also found the June reset was clearly beneficial to the guarantors, as the loans they were liable under were already in default, but the reset allowed "additional time to pay off the amounts they had guaranteed." Furthermore, the court found the guarantors already "had continuing personal obligations" to pay the debt before

the June reset.[5]  For these reasons, the court found the fraud claims failed as a matter of law, as did the claim for punitive damages.  Lastly, the court found no remaining genuine issues of material fact on the bank's breach-of-contract claims against Long and the Krishans and granted summary judgment on that claim as well.

The court denied Long and the Krishans' later motion to reconsider and issued entry of judgment and a decree.  Long and the Krishans appeal, challenging each of these adverse summary judgment rulings.[6]

## II.     Standard of Review

"The standard of review for district court rulings on summary judgment is for correction of errors of law."  *Kunde v. Est. of Bowman*, 920 N.W.2d 803, 806 (Iowa 2018).  Summary judgment is appropriate only when the moving party has shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Iowa R. Civ. P. 1.981(3).  "In determining whether a grant of summary judgment was appropriate, we examine the record in the light most favorable to the nonmoving party, drawing all legitimate

---

[5] This was true as to Manoj and Long only, as Priti did not sign a continuing personal guaranty until the June reset.

[6] The sizeable appendix submitted in this appeal, topping out at 2692 pages, contains more than 1000 pages worth of exhibits, including excerpts from deposition transcripts.  The appendix's table of contents simply lists the exhibits by letter or number with no description of what they are.  And some exhibits have the same number or letter as one or more of the other exhibits, thus making the already large appendix hard to navigate.  As a practice pointer for litigants, Iowa Rule of Appellate Procedure 6.905(4)(c) mandates that when an exhibit is included in the appendix, the table of contents shall "give a concise description of the exhibit." Furthermore, under rule 6.905(4)(b), "[i]f portions of a court reporter's transcript of testimony are included in the appendix, the table of contents shall state the name of each witness whose testimony is included."

inferences that may be drawn from the evidence in his or her favor." *Homan v. Branstad*, 887 N.W.2d 153, 163–64 (Iowa 2016). Summary judgment is appropriate "if the record reveals only a conflict concerning the legal consequences of undisputed facts." *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2016) (quoting *Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd. of Dirs.*, 754 N.W.2d 854, 857 (Iowa 2018)).

### III. Analysis

#### A. Grant of MidWestOne Bank's First Motion for Summary Judgment—Contract-Based Counterclaims

The district court's ruling on the bank's first motion for summary judgment disposed of the counterclaims brought by Long and the Krishans for breach of contract and interference with contract.[7] On these claims, the bank repeats the arguments it made, but lost on, in district court—that Long and the Krishans cannot recover on claims belonging to Zero Energy given the establishment of a bankruptcy estate that has dominion over these claims. *See Johnston Equip. Corp. of Iowa v. Indus. Idem.*, 489 N.W.2d 13, 16 (Iowa 1992) ("[A] successful party need not cross-appeal to preserve error on a ground urged but ignored or rejected in trial court.").

Zero Energy filed for bankruptcy on March 25, 2018, shortly after being sued by the bank. "The filing of a [bankruptcy] petition creates a bankruptcy estate consisting of all the debtor's assets and rights." *Mission Prod. Holdings, Inc. v.*

---

[7] The bank submits that error was not preserved "because, as the [d]istrict [c]ourt correctly pointed out," Long and the Krishans did not "specifically address[] these claims in their briefing" in resistance to the bank's summary judgment motion. We disagree. Although they provided more substance in resistance to summary judgment on other claims, they still resisted these claims.

*Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019). The estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *Lobbrecht v. Chendrasekhar*, 744 N.W.2d 104, 106 (Iowa 2008) (quoting 11 U.S.C. § 541(a)(1)). "The property of a bankruptcy estate is 'broadly defined,' . . . [and] includes all causes of action that the debtor could have brought at the time of the bankruptcy petition." *Id.* (alterations in original) (citation omitted). Because the counterclaim allegations pre-date the creation of the bankruptcy estate, the claims generally belong to the bankruptcy trustee, who elected not to pursue them. *See id.* at 107–08 (describing when cause of action accrues for bankruptcy purposes); *see also In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d 1222, 1225 (8th Cir. 1987) ("Any of these actions that are unresolved at the time of filing then pass to the trustee as representative of the estate, who has the responsibility under Section 704(1) of asserting them whenever necessary for collection or preservation of the estate."). Instead, the trustee stipulated to granting the bank relief from the automatic stay in district court so that the bank could pursue its collection efforts against Zero Energy—efforts that resulted in a court-appointed receiver's sale of collateral for $2,000,000.00.

Long and the Krishans do not challenge the premise that they cannot assert claims on Zero Energy's behalf. They instead contend their contract-based counterclaims sought recovery for individual injuries they sustained as guarantors of the Zero Energy debt. While the counterclaims were framed that way, they were still solely based on the allegation that "[b]ecause Zero Energy sustained damages" on those claims, "that would reduce or eliminate [the] guarantor obligation." To illustrate, the counterclaims for breach of contract alleged:

"Because there were no breaches in payment, and no opportunity to cure any non-payment breaches, the [b]ank in accelerating the loans and bringing action to collect on them breached the contractual relationships of Zero Energy" and the guarantors. And the counterclaims for interference with contract similarly alleged: "The actions of the [b]ank in interfering with the venture capital restructuring in the spring of 2017 was an improper interference with the contractual relationships of Zero Energy and [the guarantors], and as a result, Zero Energy sustained damages." None of the counterclaims' allegations, even as those allegations morphed over the course of the litigation, asserted that the bank breached any of its guaranty agreements with Long and the Krishans or that the bank interfered with contracts they sought in their individual capacity. Nor is any argument to that effect made on appeal.

Generally, guarantors may not pursue individual actions for injuries to a corporation when the guarantor's alleged injury merely stems from injury to the corporation. *See Quarles v. City of E. Cleveland*, No. 99-3050, 1999 WL 1336112, at *4 (6th Cir. Dec. 20, 1999) ("Quarles attempts only to collect damages allegedly due *the corporation* solely because of his position as a guarantor of corporate debt—a position unrelated to the underlying claims Quarles seeks to assert. Sister courts that have addressed similar issues have unanimously agreed that, in order to obtain standing to assert a claim, a guarantor's injury must not stem from the harm done to the corporation. Instead, any redressable injury must flow from individualized harm done to the plaintiff, separate from any claims that the corporation may assert."); *see also Taha v. Engstrad*, 987 F.2d 505, 507 (8th Cir. 1993) ("[G]uarantors of corporations generally may not bring individual actions

to recover what they consider their share of the damages suffered by the corporation." (citing *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 882 (Iowa 1983))).

Under Iowa law, a guarantor can only bring an individual action upon a showing that he or she was owed a special duty or suffered a distinct injury. *Id.* (citing *Cunningham*, 332 N.W.2d at 883). Here, the contract counterclaims hinged on damages to Zero Energy on its potential claims against the bank, which belonged to the bankruptcy estate, and were not based on any distinct injury or alleged special duty owed to Long and the Krishans as guarantors. We accordingly conclude that summary judgment was proper on these claims.

We also conclude that summary judgment was proper on the merits of the counterclaims. Long and the Krishans seem to argue fact issues remain on whether a default occurred, whether there was a right to cure, and consequently whether the bank breached the June 2017 credit agreement by pursuing remedies. *See Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (setting out breach-of-contract elements). But the record is undisputed that Zero Energy was in default of the June 2017 credit agreement for (1) failing to send borrowing base certificates for September, October, and November 2017 until January 22, 2018; (2) failing to maintain a minimum balance of $1,000,000.00 in a Tri-Star account Manoj pledged as security for the loans; and (3) failing to prepay revolving exposure in excess of the borrowing base. Two notices of default were provided by the bank—one on December 14, 2017, and another on January 24, 2018, and the defaults were not cured. While Long and the Krishans argue Zero

Energy was not given time to cure the defaults, the loan documents allowed the bank to immediately declare the loans due upon default with no cure period.

As for the contractual interference counterclaim, the only interference Long and the Krishans raise on appeal that was alleged in their counterclaims is the bank's supposed refusal to work with other lenders by the bank subordinating its own securities to those other lenders' interests. But Iowa law is clear that "a party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests." *Meinecke v. Nw. Bank & Tr. Co.*, 756 N.W.2d 223, 229 (Iowa 2008) (citation omitted).

We affirm the entry of summary judgment on these claims.

**B.      Ruling on Competing Motions for Summary Judgment—Fidelity Account**

The Krishans' claims on this point fall under Texas insurance law. They argue the Fidelity account is exempt under the Texas Insurance Code because the account's contractual terms prohibit assignment or commutation of benefits and so any assignment of benefits—which they submit would include a pledge as security—is void. On this basis, the Krishans argue they should have been granted summary judgment on the claims relating to the Fidelity account. We conclude Texas law is clear that the Krishans' arguments do not shield the account from the bank's grasp.

The record is undisputed that the Fidelity account is an annuity contract issued by a life insurance company and is therefore an "insurance policy" under the Texas Insurance Code. *See* Tex. Ins. Code § 1108.002(1) (2018). "Except as

provided by Section 1108.053," section 1108.051 governs benefits of an insurance policy and provides any such benefits:

> (1) inure exclusively to the benefit of the person for whose use and benefit the insurance or annuity is designated in the policy or contract; and
> (2) are fully exempt from:
> (A) garnishment, attachment, execution, or other seizure;
> (B) seizure, appropriation, or application by any legal or equitable process or by operation of law to pay a debt or other liability of an insured or of a beneficiary, either before or after the benefits are provided; and
> (C) a demand in a bankruptcy proceeding of the insured or beneficiary.

In turn, section 1108.053(2) provides: "The exemptions provided by Section 1108.051 do not apply to . . . a debt of the insured or beneficiary secured by a pledge of the insurance policy or the proceeds of the policy." As for assignments of benefits or rights under the policy or contract, the code "does not prevent an insured, owner, or annuitant from assigning, *in accordance with the terms of the policy or contract*: (1) any benefits to be provided under an insurance policy or annuity contract to which this chapter applies; or (2) any other rights under the policy or contract." *Id.* § 1108.101(a) (emphasis added).

> If an insurance policy, annuity contract, or annuity or benefit plan described by Section 1108.051 prohibits a beneficiary from assigning or commuting benefits to be provided or other rights under the policy, contract, or plan, an assignment or commutation or attempted assignment or commutation of the benefits or rights by the beneficiary is void.

*Id.* § 1108.102.

In sum, the exemptions in section 1108.051 do not apply when the policy or proceeds are "pledged" as security for a debt. *Id.* § 1108.053(2). And a policy holder can "assign" benefits and rights under the policy so long as it follows the

terms of the policy or contract, but any assignment or commutation is void if the policy or contract prohibits it. *Id.* §§ 1108.101(a), .102.

The Krishans' position is that a pledge of the contract as security for a debt is an assignment, and because the terms of the policy prohibit assignment, the pledge is void. Before the recodification of Texas's statutes, the Texas Court of Appeals rejected the same argument—that "a pledge is the same as an assignment for purposes of anti-assignment statutes" in the Texas Insurance Code. *Coffey v. Singer Asset Fin. Co., L.L.C.*, 223 S.W.3d 559, 563 (Tex. App. 2007).[8]

In *Coffey*, the appellants received structured settlements and "the settling insurance company purchased an annuity to fund the settlement payments." *Id.* at 561. They then obtained loans, which the lenders issued "in exchange for receiving, as collateral for the loans, security interests in appellants' future periodic payments from the structured settlements." *Id.* at 562. Later, the appellants sought a declaratory "determination that the pledges of their respective structured settlement payments as security for the loan are prohibited, and, as a result, are void." *Id.* The lenders moved for summary judgment, arguing "the insurance code only prohibited assignments and commutations, not security interests." *Id.*

On appeal, "because their structured settlement documents contain provisions against assignment or commutation by the beneficiary," the borrowers argued the lenders' "attempts to obtain security interests in the structured

---

[8] *Coffey* was decided under a prior version of the current statutes. *See* 223 S.W.3d at 563 n.4. While the old provisions are not identical to the new ones, they generally mirror one another.

settlement payments are prohibited" and void. *Id.* at 563. In support of this argument, the borrowers contended an assignment and pledge are the same thing, while the lenders argued the creation of a security interest is not an assignment or commutation. *Id.*

After reviewing the loan terms, the *Coffey* court found the loan documents merely created a lien, which is not an assignment or commutation. *See id.* at 566–67. The court started with the meaning of the words "assignment" and "pledge," which it found were not synonymous. *Id.* at 565. An assignment, in its most general sense, "means the transfer or setting over of property, or some right or interest," according to the *Coffey* court. *Id.* "In an absolute assignment, the assignor loses all control over the property assigned and can do nothing to defeat the rights of the assignee." *Id.* In contrast, "a 'pledge' is a transaction by which the collateral security is delivered by the debtor and accepted by the creditor, but legal title does not pass to the secured party." *Id.* at 566. The court reasoned the transactions before it were "not assignments because the security interests in the collateral terminate upon payment in full of the loan amounts." *Id.* The court then noted that section 3 of article 21.22, which is now section 1108.053(2), "specifically permits the pledge of proceeds of annuity contracts as security for a debt," and an "interpretation that section 5 prohibits appellants from granting appellees a security interest . . . would [require the court] to read section 3 out of the statute." *Id.* at 567.

Here, the Krishans pledged the annuity as security for the debt they guaranteed. The loan documents defined collateral to include the Fidelity account, and the commercial pledge agreement only authorized the bank to "hold the Collateral until all indebtedness has been paid and satisfied." Similar to *Coffey*,

the loan documents created a terminable lien over the account, which is not an assignment that can be voided as contrary to the terms of the annuity contract. For these reasons, we agree summary judgment in the bank's favor on the Fidelity account was proper.

**C.    Grant of MidWestOne Bank's Third Motion for Summary Judgment—MidWestOne Bank's Breach Claim and Long/Krishans' Fraud and Punitive Damage Counterclaims**

*1.    The bank's breach claim*

Under a heading in their appellate brief labeled, "[The Bank's] Underlying Contract Claims," Long and the Krishans chastise the bank and the district court for how they handled summary judgment litigation.  They argue the bank "attempt[ed] to portray [Long and the Krishans] in an unfair and negative light, confuse the trial court, and distract the trial court from the critical material issues." As for the court, Long and the Krishans assert it overlooked the bank's technical deficiencies with regard to prior summary judgments, thus reaching a result that "consistently overlooked or failed to consider [their] arguments and briefing regarding prior MSJs" that they "are extremely troubled by."  This portion of the argument does not challenge the entry of summary judgment on the breach claim or point to genuine issues of material fact negating the bank's entitlement to judgment as a matter of law.  So there is not much that can be done without "assum[ing] a partisan role and undertak[ing] the appellant[s'] research and advocacy," which is a role "we refuse to assume."  *Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974).

### 2. Fraud counterclaims

Similar to the contract-based counterclaims, the fraud-based counterclaims focus on the injuries that stem from Zero Energy's potential claims against the bank for fraud. The same standing rules discussed above apply here as well to foreclose the fraud claims. *See, e.g.*, *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1073 (10th Cir. 2002) ("[W]e reject the premise that a stockholder's status as a guarantor gives the stockholder status to assert an individual claim against a third party where that harm is derivative of that suffered by the corporation."); *Shelstad v. West One Bank*, No. 94-35275, 1995 WL 383384, at *2 (9th Cir. June 28, 1995) ("A shareholder or guarantor lacks standing to assert fraud . . . claims where the harm alleged is derivative of harm to the corporation."); *Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635, 641 (9th Cir. 1988) ("Any harm to the Sparlings due to their status as guarantors of the bonds given by the corporation is also derivative of the harm to the corporation. Thus, this status does not give the Sparlings standing."); *Stein v. United Artists Corp.*, 691 F.2d 885, 896 (9th Cir. 1982) ("[U]nder this policy against multiple liability for passed on injury, the Steins have no standing as creditors or guarantors of Century, because their losses in these respects simply reflect the injury to the corporation, which forced it to default on the loans.").

Also, as to Long and Manoj, they executed multiple continuing guaranties on all Zero Energy debt—existing and future—well before the June reset. While they claimed their signatures on the June reset guaranties were procured by fraud, Long and Manoj would still be liable for the debt because of the prior continuing

guaranties. While Priti did not sign a guaranty until the June reset, her claim is still derivative of injury to Zero Energy.

In any event, we agree with the district court that the undisputed facts show the fraud claims fail on their merits. Long and the Krishans recite the elements of their "fraud counterclaims"[9] and complain the "court only addressed fraud committed regarding the June Reset and did not address fraud committed" later or "other acts previously identified." They go on to highlight their allegations that they were misled and therefore did not "realize they were essentially receiving nothing" from the June reset and that the bank did not disclose it was about to foreclose or that it was previously undersecured. They add that the terms of the June reset provided the bank with "easier paths to trigger a default."

But, going back to the actual allegations of the counterclaims, the misrepresentation alleged was that "restructuring would be beneficial to [Zero Energy]" and the nondisclosure alleged was that the "real purpose" of restructuring was to enhance bank representatives' bonus compensation. The district court zeroed in on these specific allegations in its ruling, finding that because the guarantors' obligations were outstanding at the time of the June reset, the debt restructuring *was* beneficial to the guarantors because they were given more time to pay off the debts they guaranteed. We agree and conclude, using the same reasoning, that there was no falsity. *See Van Sickle Const. Co.*, 883 N.W.2d at 687. As to nondisclosure, the allegations highlighted on appeal are foreign to

---

[9] Those include: "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." *Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (quoting *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004)).

those that were raised in the counterclaim.  And nowhere do Long and the Krishans argue that bank representatives were under a duty to disclose the allegedly concealed "real purpose" of restructuring.  *See Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002) ("Under Iowa law, the failure to disclose material information can constitute fraud *if* the concealment is made 'by a party under a duty to communicate the concealed fact.'" (citation omitted)).  So we affirm summary judgment on these claims as well.

### 3.     Punitive damages

On the issue of punitive damages, Long and the Krishans seem to concede that if summary judgment was proper on the fraud claims then it was also proper on the claim for punitive damages.  We agree.  *See Higgins v. Blue Cross of W. Iowa & S. Dakota*, 319 N.W.2d 232, 235 (Iowa 1982) ("Punitive damages may not be recovered for a mere breach of contract; it is only when the breach also constitutes an independent tort, or other illegal or wrong act, that punitive damages become a possibility.").

## IV.     Conclusion

Having considered all of the claims raised on appeal, whether specifically mentioned in this opinion or not, we affirm the district court's rulings on summary judgment.

**AFFIRMED.**